ROSEMARY LEDET, Judge.
|, This is an involuntary termination of parental rights case. The Louisiana Department of Children and Family Services (“DCFS”) filed a petition to terminate the parental rights of the biological parents— the father, TP; and the mother, SH — of two children — a girl born on May 6, 2004, T.M.P.; and a boy born on February 3, 2006, T.M.P.3.[1] From the trial court’s judgment granting the petition to terminate only the father’s parental rights, DCFS appeals. The father does not appeal; hence, this appeal involves solely DCFS’s challenge of the trial court’s denial of its petition to terminate the parental rights of the mother. For the reasons that follow, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
On June 21, 2011, the children, T.M.P. and T.M.P. 3, came into custody of the State based on the following facts:
• DCFS received a report on June 19, 2011 of alleged “dependency drugs.” The report noted that T.M.P. disclosed that her father and mother had her going door-to-door stating she was collecting money for the American Cancer Society. According to the report, T.M.P. stated that her father would take the money and purchase drugs.
12* The report continued that the family left Georgia and was staying in a hotel in New Orleans. The report noted that the maternal grandmother (CM) went to the hotel room and observed the parents using drugs. The report further stated that T.M.P. saw her father put a needle in his arm, and her mother put a needle in her feet.
*743 • The agency (DCFS) initiated an investigation and learned that, on Sunday, June 19, 2011, the children were at the hotel, observed their mother and father sticking a needle in their arm and leg, and their parents told them not to look. T.M.P. stated that her parents were using drugs with one of their friends, Donald. T.M.P.3 also advised that his father tried to stick him with a needle in the past.[2]
On June 22, 2011, the trial court signed an Instanter Order placing the children in DCFS’ temporary custody. On June 24, 2011, a continued custody hearing was held; and the children were continued in DCFS’ custody. On July 6, 2011, a petition was filed to have the children declared in need of care. On July 20, 2011, a family team conference was held at DCFS’ office; on the case plan cover sheet, SH was listed as “incarcerated.”[3] On August 15, 2011, an answer hearing was held on the petition to have the children declared in need of care. Neither parent attended the hearing. SH was listed as “absent mother;” TP was listed as “absent father.”
IsOn August 24, 2011, following an adjudication hearing, the trial court declared the children in need of care. The trial court also ordered that the children remain in DCFS’ custody under the terms and conditions of the case plan set forth in DCFS’s August 8, 2011 court report. The report indicated that the children were entering kindergarten and second grade, and were in overall general good health. The initial placement of the children was with the paternal aunt, KR, who lived in Algiers, Louisiana.[4]
The goal of the initial case plan was reunification. To accomplish that goal, the case plan required the parents to do the following: (a) maintain contact with the agency (DCFS) by phone and in person, (b) maintain suitable housing for their children, (c) keep their whereabouts known to the agency, (d) make themselves available *744 for home visits with DCFS’ case manager, (e) pay $25 per child in monthly parental contributions to support their children while in foster care, (f) submit to a psychological evaluation and follow all recommendations, (g) complete substance abuse treatment, (h) complete parenting education classes and demonstrate learned skills, (i) submit to random drug screens, and (j) maintain a relationship with their children. The case plan also included a visitation contract, which provided for weekly supervised visits on Wednesday from 6 p.m. to 8 p.m. at the home of the paternal aunt, KR.
On December 15, 2011, an administrative review meeting was held at DCFS’ office; the case plan cover sheet for this meeting reflects that both parents ^attended. On February 10, 2012, a review hearing was held. The second case plan, set forth in DCFS’s February 7, 2012 court report, was stipulated to by the parties. The trial court continued the children in DCFS’ custody. The goal of the case plan remained reunification with the parents. Both the case plan requirements and the visitation contract schedule remained the same. At this point, however, the children were placed with their paternal grandmother, LG, which placement was noted to be in close proximity to the parents. The trial court admonished both parents to follow the case plan and ordered them to submit to drug testing that day. On that date, TP and SH both submitted to drug tests; and the results of both their drug tests were positive for “Opiates and THC.”
In its February 7, 2012 court report, DCFS stated that neither parent had taken any steps towards completing their case plan and reuniting with them children. DCFS, however, acknowledged that both parents had submitted to a substance abuse assessment with an Office of Addictive Disorders (“OAD”) counselor, but neither parent had followed the recommendations. DCFS also acknowledged that the parents had established and maintained a relationship with their children. In all other respects, the parents had not complied with the case plan. The DCFS’ recommendation was that it continue to work with the parents towards reunification for another three months “but if their [the parents’] cooperation and compliance do not improve, DCFS will be staffing the case to consider other permanent plans, including adoption.”
On May 14, 2012, an Adoption and Safe Families Act (“ASFA”) review hearing was held; neither parent was present. The court ordered that the children | sremain in DCFS’ custody. The parties stipulated to the third case plan, set forth in DCFS’s May 7, 2012 court report. Although the case plan requirements remained the same, the case plan goal changed from reunification to adoption. The goal was changed due to both parents’ noncompli-anee with the case plan over the previous eleven months. In DCFS’s May 7, 2012 report, it noted that SH had not made any progress towards completing her case plan and reuniting with her children; particularly, the report stated:[5]
[SH] has not kept in contact with the agency by phone and in person. At the previous court hearing held February 10th, 2012, [SH] provided DCFS case manager with her current address and telephone numbers. DCFS case manager has attempted to make contact with [SH] via telephone and mail several times since then to no avail.
*745 [SH] has submitted to a substance abuse assessment with an OAD counsel- or and has not followed the recommendations. At the previous court hearing she stated that she was attending substance abuse treatment at a local church [the Fresh Start program] and showed DCFS case manager her attendance sheets. At the time she had attended 2 sessions. DCFS case manager contacted the treatment provider in early April to follow up on progress made. The provider stated that [SH] only attended until the end of March and after receiving her prescription for Suboxone her attendance ceased. He stated that he tried many times to make contact with her, all to no avail.
[SH] has not attended or participated in parenting education class with Volunteers of America/Family Resource Center. DCFS case manager made another referral for [SH] for parenting education classes; however, she did not make herself available to complete the intake process and attend the class.
[SH] has not contributed $25.00 per child monthly towards the financial care of her children while in foster care. [SH] has not submitted to a psychological evaluation. [SH] has not submitted to random drug screens (hair/urine).
[SH] has maintained a relationship with her children by visiting weekly at her mother in law’s house where the children are placed.
| fiDCFS’ May 7, 2012 report stated that both children were doing well in school, academically and behaviorally. The report further stated that the paternal grandmother was in the process of becoming a certified foster parent. According to the report, the paternal grandmother stated that the parents had “been visiting at least weekly with the children,” that “the visits had been going well,” and that both parents had attended the children’s birthday parties and other major celebrations with the family, such as Mardi Gras and Easter.
On June 26, 2012, DCFS filed a Petition for Termination of Parental Rights and Certification for Adoption, seeking to terminate the parental rights of both parents, SH and TP, to both children, T.M.P. and T.M.P.3. In the petition, DCFS alleged that the parental rights of SH and TP should be terminated on two statutory grounds: (i) abandonment for failure to support under La. Ch.C. art. 1015(4)(b);[6] and (ii) failure to comply with their case plan under La. Ch.C. art. 1015(5).[7] As to |7the first ground, DCFS alleged that “[e]ach parent has failed to provide significant contributions to the children’s care and support for a period of six consecutive months between June 21, 2011, and the date of filing of this petition.” As to the *746 second ground, DCFS alleged that the children were placed in DCFS’ custody on June 21, 2011, and thus had been removed from their parents’ custody for over one year, and that the parents had failed to make substantial compliance with the court approved case plan for services for the safe return of the children.[8]
As to SH in particular, DCFS alleged:
1. The mother’s case plan requires her to maintain safe and stable housing, make parental contributions, make herself available for DCFS visits, visit with her children, submit to a psychological evaluation, successfully complete parenting classes, successfully complete a substance abuse program, and submit to random drug screens.
a.She had a home, but she has moved and not maintained contact with DCFS or provided her new contact information promptly; DCFS had to |ssearch for her through relatives; she has not made herself available for home visits;
b. She has not made parental contributions to the agency;
c. She missed three appointments for the scheduled psychological evaluation;
d. She completed the assessment with the Office of Addictive Disorders, but did not follow through with any of the recommended treatment and has not submitted to random drug screens.
e. She has not initiated or completed parenting classes.
f. She has maintained contact with the children who are placed with her mother-in-law.
2. The mother lacks substantial improvement in redressing the issues that brought the children into care. She has not addressed her substance abuse issues.
DCFS further alleged that despite attempted interventions, no reasonable expectation of significant improvement in the parents’ condition or conduct existed in the near future given the children’s ages and their need for a stable and permanent home.[9] DCFS still further alleged that *747 “[t]he parents have a pattern of behavior of neglecting their children’s needs and avoiding correction of their lnproblems. The parents’ drug abuse is long standing and chronic.” Finally, DCFS alleged that “[t]he children are in a safe place, with relatives” and that it is in the children’s best interests that they be freed for adoption.
On July 20, 2012, a hearing was held on the Answer to Petition; both parents answered the petition. On October 15, 2012, the termination trial commenced; neither parent was present. The parents’ attorneys indicated they were unable to reach their clients at their last known address, 1004 Eli Court, Apartment A, Gretna, Louisiana. Following arguments regarding whether the parents were properly served, the trial court allowed DCFS to present testimony of two witnesses: Michelle Robertson, the DCFS’ case manager; and LG, the paternal grandmother and foster parent.
Ms. Robertson testified that the parents had taken no steps to comply with their case plan. She testified that the parents never informed her of a change in their address. Although she set up a psychological evaluation for the parents, they failed to attend. The parents also failed.to attend parenting classes. Although the parents submitted to an initial assessment for substance abuse in October 2011, they failed to attend any of their appointments for substance abuse treatment.
As to visitation, Ms. Robertson testified that the parents regularly visited with the children on a weekly basis, as provided for in the case plan visitation contract, at the paternal grandmother’s house until July 2012. In July 2012, the parents were told that they needed to make contact with DCFS to continue visits. Ms. Robertson explained that, in July 2012, DCFS moved the visits to its office | in“because we had thought that they [the parents] would make contact with us if they were able to visit with their children at our office.” However, the parents failed to contact the DCFS. Ms. Robertson stated that her last contact with the parents was after the February 2012 court hearing. The parents thus did not visit the children from July 2012 to October 2012.
Both Ms. Robertson and the paternal grandmother, LG, testified that neither parent had paid the $25 a month per child in child support. LG acknowledged that the parents had bought a football uniform for T.M.P.3.
After hearing the testimony, the trial court, out of an abundance of caution, continued the trial to allow the parents’ attorneys additional time to locate their clients. The trial court expressed its concern that the parents may not have been adequately notified of the trial and that they may not have understood that their parental rights could be terminated. In deciding to continue the trial, the trial court made the following observations:
Sounds like these two people are deadbeats, but they have made some minimal attempts at visitation and a very *748 minimal attempt, I mean, at supplying a football uniform. And some of these things just date back a couple of months. I’m not sure — I’ve never terminated parental rights on this type of short notice.
They last visited the children a couple months ago [July 2012], They contacted grandmother just a couple of weeks ago, and the record is devoid of any actual definite notice of today’s proceeding.
[[Image here]]
[In response to DCFS’ counsel’s statement that it has been a long process for the children, the trial court stated:] I understand, but they may not be fully aware. They’re with the grandmother. Okay. They [the parents] may think that everything, not as honky-dory, but whenever I want the kids back, I can go back and get them from grand-maw.
* * * * * *
I don’t know what they’re like. I don’t know how intelligent they are. They sound like they’re kind of deadbeats, because they’re not taking care of their kids, but I just want to make sure that they actually know that this is a termination, and this is not some just hearing that they don’t have to make, because nothing’s really going to come down out of it.
I don’t foresee them getting these kids back any time soon, if ever. However, like the magic words, in an abundance of caution, all right, since I’m not sure if they actually know that this is happening today, I want to give the two attorneys one more chance to contact them, and let them know in no uncertain terms that this is it.
If they come in, I’ll listen to what they have to say, and I still may rule against them, in all possibility based upon — you know, but, at least, I want to give you one more shot in trying to let them know in no uncertain terms, like I said, this is actual termination. They will have no more rights after that.... And if they don’t — unless something extraordinary happens, I’m going to rule in favor of the termination.
The trial court also commented that the children were with a family member and that they were doing well. The court thus ordered the trial continued to November 9, 2012.
On November 9, 2012, the parents appeared for the resumption of the termination trial. Over the State’s objection, the trial court granted the parents’ oral motion to continue to allow the parents additional time to seek in-patient substance abuse treatment. The trial court, however, ordered the parents to follow the case plan and to get help. The trial court warned the parents that if they failed to comply, their parental rights would be terminated.
In December 2012, both parents attended an administrative review hearing at DCFS’ office. According to DCFS’ case manager, Ms. Robertson, the case plan requirements remained the same. Ms. Robertson testified that, as of December 2012 neither parent had completed any portion of their case plan. Ms. Robertson reported that shortly thereafter the parents contacted her. The parents indicated that li2they were having difficulty expediting the process of getting into an in-patient substance abuse program without a court order. The parents requested DCFS’ help in obtaining such a court order.
On December 6, 2012, DCFS filed a motion to re-set trial for parents’ in-patient treatment. The trial court granted the motion and ordered that the parents “seek immediate admission into an in-patient substance abuse treatment program, and that DCFS assist them with an admis *749 sion, so that the results of the substance abuse treatment are available to the Court for the trial date of February 21, 2013.”
The parents went to separate in-patient programs. SH went to Fairview Treatment Center. She was admitted into the program on January 21, 2013; and she was discharged on February 21, 2013, the same day as the next court hearing.
At the February 21, 2013 hearing, the trial court was advised that the parents were continuing them detoxification program. The court again continued the trial because SH was finishing a detoxification stay, and TP was in the middle of a detoxification program. On March 29, 2013, the father, TP, was asked to leave the inpatient treatment facility where he was being treated because he brought opiates into the facility. After TP’s release, TP and SH separated.
In the interim, on February 28, 2013, DCFS filed a motion to re-set the trial for a second time for the parents’ in-patient treatment. The trial court granted the motion and ordered that upon completion of the detoxification programs, the parents immediately enroll and participate in all recommended in-patient or intensive out patient substance abuse treatment, and attempt to complete treatment, including random drug screens and parenting classes, before the May 16, 2013 trial date.
| iSOn April 16, 2013, SH contacted Ms. Robertson and informed her that she and TP recently had separated. SH also informed Ms. Robertson that she wished to work on the case plan and that she needed to be refreshed on the requirements for completing the case plan.
In April 2013, SH, at Ms. Robertson’s request, submitted to drug test screenings — hair and urine. The urine screen was negative, but the hair screen was positive for morphine. On May 14, 2013, Ms. Robertson again had SH submit to drug test screenings. The urine screen again was negative. The hair screen again was positive, but the levels of morphine were lower than at the time of the April 2013 screenings. On May 7, 2013, SH, in compliance with the case plan, was examined by a psychologist.
On May 16, 2013, the trial court, over the State’s objection, continued the trial at SH’s attorney’s request. SH’s attorney advised the court that SH was working on the case plan; however, a drug test screening of SH’s hair was taken, and the results were pending. SH’s attorney noted there were some other concerns.
After multiple continuances, the termination trial resumed and was completed on May 29, 2013. The mother, SH, was present; the father, TP, was not. TP’s attorney indicated that he could not locate his client and submitted without objection. The following four witnesses testified: Ms. Robertson, DCFS’ case manager; SH, the mother; LG, the paternal grandmother, foster parent, and prospective adoptive parent; and CM, the maternal grandmother.
To provide a background for analyzing the issues presented on this appeal, we briefly outline the evidence presented at the May 2013 trial. In so doing, we utilize the six topics covered by the parents’ case plans: (i) support obligation, 114(ii) housing, (iii) visitation, (iv) substance abuse treatment, (v) parenting classes, and (vi) psychological evaluation.
(i) Support obligation
The case plan required the parents pay $25 per child in monthly child support. The paternal grandmother and foster parent, LG, both testified that during the two years the children have been in foster care, neither parent paid any child support. LG testified that the parents sent *750 Christmas presents for the children. Ms. Robertson testified that SH would bring food or snacks for the children during the visits at the office.
Although SH did not deny that she failed to pay child support, she testified that she had provided material things for the children, including food, clothing, shoes, a football uniform for her son, and cheerleading supplies for her daughter. SH explained that she was unable to work because of the weekly parenting and substance abuse classes that she was required to attend. She stated that she planned to obtain her GED and to go back to work waitressing and housecleaning.[10]
(ii) Housing
The case plan required that the parents maintain suitable housing and keep DCFS informed of their whereabouts. During the course of the proceedings, the parents lived in multiple locations. In October 2012, when the trial commenced, the parents were living in an apartment owned by the father’s employer on Eli Court in Gret-na; the father was working maintaining the apartments. SH testified that they continued to live at that address through November or December 2012.
|15In January or February 2013, for a short period before entering in-patient treatment programs, the parents lived with one of the grandmothers. According to SH, they lived with the paternal grandmother, LG. According to LG, the parents never lived with her during the entire time that she had the children in her foster care; rather, LG testified that the parents lived for some of that time with the maternal grandmother, CM.
The parents attended separate in-patient treatment programs. SH was in treatment from January 21, 2013, to February 21, 2013. After being discharged, SH testified that she lived with her mother, CM, the maternal grandmother, until April 1, 2013. CM confirmed that SH lived with her until April 1, 2013. On that date, SH and CM had a heated argument regarding drug (Suboxone) use in CM’s home.[11] On the same day as the argument, SH moved in with her brother and his family in Arabi, Louisiana. A few days before the argument, on March 29, 2013, the father, TP, was asked to leave the inpatient treatment facility where he was being treated. After TP was released from the facility, TP and SH separated. SH testified that they have continued to live separate and apart and that she planned to divorce TP.
On May 29, 2013, when the termination trial resumed, SH was still living with her 11Bbrother’s family. SH testified that she *751 was able to continue living with her brother’s family until she sold her house. She explained that she owned a house in St. Bernard Parish that was repaired following Hurricane Katrina, but damaged again in Hurricane Isaac. She stated that the house was her own separate property. She testified that her house was in fair condition, but no one was currently living there. She indicated that her plans were to sell her house, to buy the property across the street from it, and to put a modular house on the property.
According to Ms. Robertson, neither parent complied with the case plan requirement of keeping DCFS informed of their whereabouts and contact information until April 16, 2013. On that date, SH telephoned Ms. Robertson and provided her with that information. At that point, SH was living with her brother’s family. The brother’s home contained a bed for each of the children, T.M.P. and T.M.P.3. Ms. Robertson testified that she visited the brother’s home, which was being renovated, and characterized it as “clean” and “adequate.”
(iii) Visitation
The case plan included a requirement that the parents maintain a relationship with the children, and it included a visitation contract schedule. Until July 2012, the parents regularly visited with the children at the paternal grandmother’s house weekly as provided for in the visitation contract schedule. From July 2012, when the visits were moved to DCFS’ office, to October 2012, when the trial commenced, there were no visits. The extent of visitation that occurred between October 2012 and April 2013 is unclear. According to Ms. Robertson, during that time frame, the parents were regularly visiting the children in the paternal grandmother’s (LG’s) home. She explained that “[u]ntil she [SH] called me [on 117April 16, 2013] and told me that she was having an issue, the visits were fine.” Ms. Robertson further testified that “[i]t was liberal visits [as opposed to a visitation schedule], because at the time they [the parents and LG] were having a good relationship.” Ms. Robertson testified that the issue with the visits did not begin until the parents separated. Ms. Robertson further testified that after SH contacted her on April 16, 2013, and informed her that the visits were not occurring, she arranged to have the visits at DCFS’ office. At the time of the May 2013 trial, Ms. Roberson and SH both testified that SH was regularly visiting with the children at DCFS’ office.
LG testified that the parents had no visits with the children after they entered into rehabilitation programs. Nonetheless, LG explained that during this time frame, she allowed the maternal grandmother, CM, to take the children to her house for visits. LG further explained that she stopped allowing CM to take the children for visits when the parents separated because she “was concerned about the separation of [the parents] and what type of drama it would actually bring.” Addressing this change in family dynamics, the trial court commented: “[d]oes that make a bell go off or something in your head? I mean, the parents split, and now mother-in-law is having a problem with the mother.”
(iv) Substance abuse treatment
The case plan requires the parents to submit to a substance abuse assessment with OAD and follow all recommendations. It further requires that the parents submit to random drug screens — hair and urine— as requested by the agency or treatment provider. SH submitted to an initial substance abuse assessment with OAD in October 2011; however, she failed to attend *752 any of the appointments. In February 2013, SH completed an in-patient substance abuse program. SH | ^established that during February and March 2013, she attended five meetings at the Fresh Start program. SH also attended “NA/AA” meetings at Delta Medical Clinic on three days in March 2013.
After SH contacted Ms. Robertson in April 2013, she was referred to ACER— Addiction Counseling & Educational Resources (“ACER”). On April 25, 2013, SH enrolled in ACER’S outpatient substance abuse program; her attendance at ACER was verified from April 25, 2013 through May 21, 2013. During April 2013, SH admitted at ACER to alcohol use. At the time of the May 2013 trial, SH was submitting to random drug screens at ACER. All of SH’s urine screens at ACER were negative.
SH testified that she last used drugs in January 2013, when she used heroin before entering detoxification and rehabilitation.[12] As noted above, in both February and April 2013, SH submitted to random drug screens — hair and urine — at DCFS’ request. Although the urine screens were negative, the hair screens were positive for morphine. The trial court found that SH’s admission that she used heroin in January 2013 explained the April 2013 positive hair screen test result; the trial court stated that “the issue of why the morphine showed up was evident from SH’s own testimony.”[13]
(v) Parenting classes
|iaThe case plan required the parents to participate in parenting education classes and to follow all of the recommendations. On May 6, 2013, SH enrolled in parenting classes. As of the May 29, 2013 trial date, Ms. Robertson testified that SH had completed three or four of the sixteen parenting classes. SH testified she had completed an additional parenting class on the day before the trial.
(vi) Psychological evaluation
The case plan required the parents to undergo a psychological evaluation and to follow any recommendations made by the evaluator. On May 7, 2013, SH, in compliance with the case plan, was examined by a psychologist, Christine Powanda, Ph.D. (As noted elsewhere, the Psychologist’s Report was introduced at trial.) SH testified that the reason she delayed undergoing a psychological evaluation until May 2013 was because she was on drugs. In her report, the psychologist stated that SH told her that she last used heroin on January 18, 2013, and that she has remained drug free and compliant with her outpatient substance abuse treatment. The psychologist recommended that SH be seen by a psychiatrist for her anxiety symptoms, receive counseling for survivors of *753 sexual abuse, continue to submit to regular drug screens, remain involved in substance abuse treatment, and continue in parenting classes. Pertinent to the issue presented in this termination case, the psychologist recommended that SH continue to comply with DCFS’ case plan and suggested recommendations to work toward reunification with her children.[14]
|2nFollowing the testimony, the trial court refused to take the case under advisement. Ruling from the bench, the trial court denied the petition to terminate SH’s paternal rights. In so doing, the trial court observed:
[M]y strong suggestion, after reading the psychological report, and listening to the testimony, it’s the Court’s opinion that the mother is finally, finally, seems to be seriously trying to get straight and to become a mother. You got a long way to go. Now I don’t know if you’re strong enough. I don’t know whether you’re serious enough. Seems like the last couple of months you may be serious. All right. But you’re going to have to remain that way for a long time.
[[Image here]]
I think t here’s hope there, but you have to be consistent in pursuing the therapy or the meetings, the parenting classes, all those things. And then when you get some of this behind you, then you need to get a job.
[[Image here]]
And then get into the real world, not some space cadet, drug-induced hysteria that you’ve been living in, and get away from abusive people. You’ve had a bad childhood, at least as far as I can read in the report, and you seem to have been involved with several people, men, who are not good people.
You need to get your head straight, and get around decent people. And I’m going to tell you another thing, being around and taking your kids around your mother, I wouldn’t. And I hope the State, if they work with you, make that part of their program, because she’s whacked out.
The trial court expressly noted that the welfare of the children was paramount, and the court praised the paternal grandmother, LG, for taking good care of the children.
On June 10, 2013, the trial court rendered judgment denying DCFS’ petition to terminate SH’s parental rights.[15] In its judgment, the trial court ordered that I21DCFS maintain custody of the children, that DCFS “continue to work with the mother towards reunification,” and that DCFS “provide the mother a ease plan and file a copy with the Court within ninety (90) days of this judgment.” This appeal by DCFS followed.
STANDARD OF REVIEW
It is well-settled that a trial court’s findings on faetually-intense termination of parental rights issues — including a parent’s compliance with the case plan, a parent’s expected success at rehabilitation, the expected significant improvement in the parent’s condition or conduct, and whether termination is in the children’s *754 best interests — are reviewed on appeal under a manifest error standard of review.[16]
DISCUSSION
On appeal, DCFS raises multiple issues pertaining primarily to the sufficiency of the evidence.[17] DCFS contends that it established by clear and |Mconvincing evidence both of the enumerated statutory grounds on which it sought termination of SH’s parental rights' — abandonment by nonsupport;[18] and failure to substantially comply with the case plan[19] coupled with a lack of a reasonable expectation of significant improvement in the near future.[20]
*755 DCFS further contends that when, as in this case, a statutory ground is established, the court is required to enter judgment terminating the parent’s rights unless for some extraordinary reason there is evidence demonstrating that the child’s best interest would not be served. In support of this argument, DCFS cites In Interest of Boudreaux, 427 So.2d 891, 897 (La.App. 1st Cir.1983), for the proposition that when all the requirements of a ground have been proved, “it necessarily follows that the best interest of [the child] would be served by | ^termination of parental rights.”[21] DCFS thus contends that because SH failed to meet her burden of establishing the existence of any extraordinary circumstances, the trial court erred in denying its petition to terminate SH’s parental rights.[22]
DCFS also contends that it established termination was in the children’s best interests based on the timing element — the fact that the children have been in foster care for over two years by the completion of the trial.[23] The gist of DCFS’ argument is that the children need permanency and stability and that forcing them to remain in foster care indefinitely, when there is only a hope of reunification, violates the state and federal mandates to further the children’s best interests. See La. Ch.C. art. 1004.1 (mandating that a petition to terminate be filed when the children have been in foster care for seventeen of the last twenty-two months);[24] l^see also La. Ch.C. art. 1032 (requiring the court avoid delays in resolving termination proceedings).[25]
Finally, DCFS contends that the trial court incorrectly focused on SH’s interests over the interests of the children, T.M.P. and T.M.P.3. DCFS emphasizes that the children are “healthy and happy with their grandmother.” Indeed, it points out that the trial court specifically found that the *756 children were appropriately placed with the paternal grandmother, LG, and that LG was taking good care of the children. DCFS also emphasizes that if SH’s parental rights are terminated, SH can continue to have contact with the children if “she gains and maintains sobriety.”
This court set forth the burden of proof that the State must satisfy to terminate parental rights in State in Interest of C.A.C., 11-1315, pp. 7-8 (La.App. 4 Cir. 2/1/12), 85 So.3d 142, 146-47, as follows:
In an involuntarily termination of parental rights case, courts must balance the often competing interests of the natural parent and the child. Mitchell, 01-2128 at p. 8, 800 So.2d at 814-15. The child has an interest in terminating parental rights that preclude or delay adoption and inhibit establishing stable, long-term family relationships. State ex rel. G.J.L., 00-3278, p. 6 (La.6/29/01), 791 So.2d 80, 86. Natural parents have a fundamental liberty interest in the care, custody, and management of them child that “ ‘does not evaporate simply because they have not been model parents.’ ” Mitchell, 01-2128 at p. 8, 800 So.2d at 814 (quoting Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606 (1982)). Congruent with the parent’s interest, the State has an interest in terminating parental rights under certain circumstances. State in the Interest of A.C., 93-1125, pp. 9-10 (La.10/17/94), 643 So.2d 743, 748 (citing La. Ch.C. arts. 1004 and 1015).
| asThe permanent termination of the parent-child legal relationship is one of the most drastic actions the State can take against its citizens. State ex rel. A.T., 06-0501, p. 4 (La.7/6/06), 936 So.2d 79, 82. As noted above, natural parents have a fundamental liberty interest in maintaining them legal relationship with their child. When the State seeks to terminate the relationship, due process requires that a fundamentally fair procedure be followed. In re State ex rel. D.C.P., 05-212, p. 7 (La.App. 5 Cir. 10/6/05), 916 So.2d 1206, 1209. For these reasons, the Louisiana Legislature has imposed strict procedural and evidentiary requirements that must be met before the relationship can be terminated. See S.L.W., supra.
Eight statutory grounds for the involuntary termination of parental rights are enumerated in La. Ch.C. art. 1015. Although the State need only establish one statutory ground, the trial court must also find that termination is in the child’s best interests. La. Ch.C. arts. 1015 and 1039. Moreover, given the draconian nature of an involuntary termination proceeding, the State is required to prove the statutory ground on which it relies by clear and convincing evidence. La. Ch.C. art. 1035 A; Mitchell, 01-2128 at p. 10, 800 So.2d at 816. To satisfy the onerous clear and convincing standard, the State must establish that the parent’s failure to comply with the statutory ground is highly probable. State in the Interest of Q.P., 94-609, p. 4 (La.App. 3 Cir. 11/2/94), 649 So.2d 512, 515.
Summarizing, involuntary termination of parental rights is a two-pronged inquiry. First, the State must prove by clear and convincing evidence the existence of at least one of the eight statutory grounds for termination under La. Ch.C. art. 1015. Second, but only after the ground for termination is found, the trial court must determine whether the termination is in the child’s best interests. La. Ch.C. art. 1039; State ex rel. L.B. v. G.B.B., 02-1715, pp. 5-6 (La.12/4/02), 831 So.2d 918, 922.

Id.

Although termination of parental rights requires a two prong inquiry, we find it *757 unnecessary in this case to address the first prong, regarding the statutory grounds for termination, given our finding on the second prong. On the second prong, we find no manifest error in the trial court’s factual finding that terminating SH’s parental rights at this juncture is not in the children’s best interests.
The controlling statutory provision is La. Ch.C. art. 1037(B), which provides:
|2fiWhen the court finds that the alleged grounds set out in any Paragraph of Article 1015 are proven by the eviden-tiary standards required by Article 1035 and that it is in the best interests of the child, it shall order the termination of the parental rights of the parent against whom the allegations are proven. The court shall enter written findings on both issues. The consideration of best interests of the child shall include consideration of the child’s attachment to his current caretakers.
La. Ch.C. art. 1037(B). As we noted in C.A.C., “after the [statutory] ground for termination is found, the trial court must determine whether the termination is in the child’s best interests.” 11-1315 at p. 8, 85 So.3d at 147. Thus, “the law poses the best interest determination as a separate consideration and envisions examination of any special conditions or exceptional circumstances that may exist.” State in Interest of D.G. v. Danny G., 30,196, p. 3 (La.App. 2 Cir. 10/29/97), 702 So.2d 43, 45. Stated otherwise, “[t]he trial court’s determination that an element of a statutory subsection for the termination of parental rights has been proven does not inherently satisfy the additional requirement that termination be in the best interest of the child.” State ex rel. I.D.H. v. Thomas, 34,962, pp. 3-4 (La.App. 2 Cir. 5/9/01), 787 So.2d 526, 529; see also State ex rel. J.T., 38,149, p. 6 (La.App. 2 Cir. 12/17/03), 862 So.2d 1130, 1134 (noting that “[wjhile the state need only establish one ground for termination, it must also establish that termination is in the child’s best interest.”).
As noted, DCFS contends that when a statutory ground is proved, the trial court is required to enter a judgment terminating parental rights absent proof of extraordinary circumstances, which it contends is lacking in this case. DCFS’s argument essentially is that proof of a statutory ground for termination gives rise to a presumption that termination is in the child’s best interests. We rejected a similar argument in State ex rel. S.L.W., 06-1560 (La.App. 4 Cir. 4/18/07), 958 So.2d 53.
|j>7In S.L.W., the State argued that its proof of a statutory violation of La. Ch.C. art. 1015 created a presumption that the totality of the circumstances showed that termination of parental rights was in the children’s best interests. 06-1560, at p. 3, 958 So.2d at 55. Finding this argument unpersuasive, this court affirmed the trial court’s denial of the State’s petition to terminate the mother’s paternal rights.[26] In so doing, this court reasoned:
*758 Article 1015(5) does not impose a strict timeframe with regards to “significant improvement in the parent’s condition or conduct,” nor do alleged violations of Article 1015 create presumptions in favor of the State. Rather, the focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated. La. Ch.Code art. 1001. Thus, the fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. But, because the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens, the courts must proceed with extreme care and caution. State ex rel. J.A., 99-2905, p. 9 (La.1/12/00), 752 So.2d 806, 811. Accordingly, while the prolonged proceedings in this case are problematic and, clearly, Impermanent or long-term foster care is not in the best interest of the children, after a careful review of the record we cannot say that the trial court was manifestly erroneous in denying the State’s termination petition at this time.
S.L.W., 06-1560 at pp. 6-7, 958 So.2d at 57-58.
In this case, like S.L.W., supra, we are presented with a trial court’s finding that the best interests of the children dictated a denial of the termination of the mother’s parent’s rights.[27] We review the trial court’s fact-intensive finding on the best interests issue under a manifest error *759 standard. As the Louisiana Supreme Court has instructed, “[t]he issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one.” Zito v. Advanced Emergency Medical Services, Inc., 11-2382, p. 5 (La.5/8/12), 89 So.3d 372, 375 (citing Stobart v. State, Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La.1993)). “If the factual findings are reasonable in light of the record reviewed in its entirety, a reviewing court may not reverse even | ^though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Zito, 11-2382 at p. 5, 89 So.3d at 375 (citing Stobart, 617 So.2d at 882-83).
Applying that standard, we cannot conclude that the trial court was manifestly erroneous in finding that it was in the best interests of the children, T.M.P. and T.M.P.3, not to terminate SH’s parental rights. The following four factors support the trial court’s factual finding on the best interest determination.
First, SH has made progress, albeit only since April 16, 2013, in completing the requirements of her case plan. Recent compliance with a case plan can support a finding that it is in the best interests of the children not to terminate a parent’s rights. State ex rel. A.C.H., 02-1014, 02-1015, p. 9 (La.App. 3 Cir. 2/12/03), 846 So.2d 791, 797. In A.C.H., the trial court relied on the mother’s recent compliance with her case plan six weeks before trial to find that termination of the mother’s parental rights was not in her children’s best interests. Id. The trial court acknowledged the mother’s previous failure to comply with her case plan up until recently, yet refused to terminate her parental rights, stating:
Having heard the testimony of both the mother and witnesses, the Court is, however, impressed that this is in fact a significant effort to turn her life around. Whether or not she can do what is required by this Court and the federal government statutes and regulations within a reasonable period of time from this day forward, I don’t know. But certainly I think at this juncture the Court is hesitant to terminate her parental rights based on the effort that she has made.
Having said that, ma’am, and having concluded that I will not terminate your parental rights this time, we will have a review hearing in six months and you’re going to have to make some effort to show that you’re going to be able to sustain for your children housing, employment, those things. You haven’t had the employment since January. The sugar and spice club or whatever it’s called is not employment that’s going to satisfy me. I hope that what’s happening for you at Naomi House is something that’s going to be strong enough to get you past this hurdle. But in six months we’ll have a review | shearing and at a juncture past six months if termination is what has to happen again, we’re not going to have a full-blown hearing again. We’ll only have that which will be required from this juncture on. I have heard enough to terminate parental rights but for what I consider to be a significant change in the last six weeks. So I guess what I’m saying is if you can prove to me in the next six months — and I’m not saying that’s when things will happen to change, but during that six months you’ll have to convince me that I can be in a position to someday award you the custody back of your children.
A.C.H., 02-1014 at pp. 8-9, 846 So.2d at 796-97.
*760 On appeal, the State in A.C.H., supra, argued that it proved by clear and convincing evidence the mother’s failure to comply with her case plan, a ground for termination under La. Ch.C. art. 1015(5). The State further argued that the trial court erred in finding that it was not in the children’s best interests to terminate the mother’s (Fernandez’s) parental rights. Affirming, the Third Circuit reasoned:
Based on our review of the evidence, we cannot say that the trial court manifestly erred in denying the termination of Fernandez’s parental rights. There is no dispute that Fernandez failed to comply with her case plan in the past. However, the trial court found that her recent behavior indicated a reasonable expectation of improvement. Because the termination of parental rights is a severe action, not to be taken lightly, the trial court’s finding that Fernandez has made recent improvements and showed a willingness to change, is in keeping with the guidance in In re J.A, 752 So.2d at 811,[28] that the “courts must proceed with care and caution” in parental termination cases. Moreover, the children remain in the stable care of their foster parents pending a review hearing to determine if Fernandez is progressing in her case plan. For these reasons, we feel the trial court did not manifestly err in finding that it was in A.C.H. and A.I.H.’s best interest that their mother’s rights to them not be terminated.
A.C.H., 02-1014 at p. 9; 846 So.2d at 797; see also State v. F.Y., 05-920, p. 19 (La.App. 3 Cir. 3/1/06), 924 So.2d 1164, 1176 (citing A.C.H., supra, for the proposition that “termination of a parent’s rights is not in the best interests of the children when, even if a parent has failed to comply with the case plan in the past, |sithe parent’s recent behavior indicates a reasonable expectation of improvement in the near future.”).
As in A.C.H., supra, SH has shown a recent willingness by her behavior, especially since April 2013, to overcome her substance abuse problem and to comply with her case plan. Indeed, Ms. Robertson, the DCFS case manager, testified that, since April 16, 2013, SH has attempted to comply with her case plan. This factor supports the trial court’s finding that it was in the children’s best interests not to terminate SH’s parental rights.
The second factor that supports the trial court’s best interest determination is the change in the family dynamics. When the children were taken into DCFS’ custody, the parents were living together; and both parents were using drugs. As noted, in February 2012, both parents tested positive for drug use. After SH completed an in-patient rehabilitation program, she separated from TP, who was thrown out of his in-patient program. SH testified that the reason for the separation was because of TP “not wanting to do the right thing.” Since the separation, SH has taken steps to complete her case plan and to overcome her substance abuse problem. Since the separation, SH testified that she has experienced difficulty with her mother-in-law, LG. The children are placed with LG, the paternal grandmother and prospective adoptive parent. SH’s difficulties with LG have included being unable to visit with her children.[29] SH testified that she believes that if her paternal rights are termi *761 nated, LG will not allow her to see her children.
^Commenting on this factor — the change in the family dynamics — the trial court during the May 2013 trial observed that it “make[s] a bell go off or something in your head? I mean, the parents split, and now mother-in-law is having a problem with the mother.” The trial court was entitled to take the change in family dynamics into consideration as a factor in making its best interest determination. This factor supports the trial court’s finding that the best interests of the children was served by not terminating SH’s parental rights.
The third factor supporting the trial court’s best interest determination is the recommendation of the psychologist who examined SH for DCFS. As noted, the psychologist’s recommendation is for SH to continue to comply with DCFS’ case plan and recommended interventions and to work toward reunification with her children. The psychologist’s recommendation is consistent with, and fully supports, the trial court’s determination that it was in the children’s best interest not to terminate SH’s parental rights.[30]
The fourth and final factor supporting the trial court’s best interest determination is the children’s desires. DCFS contends that the children’s desires should not be given any weight because “these are children’s dreams for their mother to get better.” Contrary to the DCFS’s contention, the jurisprudence has recognized that a child’s preference can serve as a justification for declining to terminate parental rights, despite proof of a statutory ground for termination. See Lucy S. McGough & Kerry Triche, LOUISIANA CHILDREN’S CODE HANDBOOK, 624 (2012). As the commentators points out, if “from questioning the child the court is persuaded that the child opposes termination of his or her parents’ rights.... [La. Ch.C. art. 1034][31] permits the court to credit [the child’s preference] in the determination of the child’s best interest.” McGough & Triche, supra. The commentators further point out that “the child’s attitude can be demonstrated by the testimony of other witnesses without forcing the child to give direct testimony.” McGough & Triche, supra at 611.
In this case, the preference of the children, T.M.P. and T.M.P.3, was demonstrated by the testimony of both the DCFS case manager, Ms. Robertson, and the paternal grandmother, LG. Ms. Robertson testified that when she visited the foster home, she separately spoke with each child. According to Ms. Robertson, the children knew that their mother was living with their uncle and that their mother was trying to do better. Ms. Robertson testified that “[b]oth children have stated that they would like to live with their mother.” The paternal grandmother, LG, likewise acknowledged that the children have stated to her that they desire to live with their mother. The record thus reflects the children’s preference to live with their mother. *762 This factor supports the trial court’s best interest determination.
Given these four factors, we cannot conclude that the trial court was manifestly erroneous in finding that it was in the best interests of the children, T.M.P. and T.M.P.3, not to terminate SH’s parent rights at this juncture.
| ^DECREE
For the forgoing reasons, the judgment of the trial court is affirmed.
AFFIRMED

. In this opinion, the initials of the parties are used to protect and maintain the privacy of the minor children involved in this proceeding. See Uniform Rules, Courts of Appeal, Rule 5-1 and Rule 5-2.

. TP denied the allegations; however, he was inconsistent with his statements. He stated that he used drugs two years ago, but then he indicated it was a few months before that he last smoked marijuana. He also noted that he took three Lortabs four days before that were bought off the street. The DCFS worker observed what appeared to be fresh track marks on TP's arms; however, TP advised that the track marks were old and that he had not used heroin in over two years. He refused to submit to a drug screen. SH denied drug use. She stated that she was in an accident and broke her back and neck. She also noted that she was on prescribed pain medication. She stated that her mother was lying because she wants her children. She stated that her children, if asked, would state that she does not use drugs. She advised that she is currently in Georgia, although her mother is advising she is still in Louisiana.

.The record reflects that the paternal aunt, KR, lived in the same house as the paternal grandmother, LG. Although the children initially were placed with the paternal aunt, the children shortly thereafter were placed with the paternal grandmother. The only explanation in the record for this change is SH's statement, noted in the Psychologist’s Report, that KR had an alcohol abuse problem. The children remained in the care of the paternal grandmother throughout the remainder of the proceedings.

. The report included similar comments regarding TP’s failure to comply with the case plan. Again, dais appeal involves solely SH.

. La. Ch.C. Art. 1015(4) provides:
Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
⅜ ⅜ ⅜ ⅜ ⅜ ⅜
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child’s care and support for any period of six consecutive months.

. La. Ch.C. art. 1015(5) provides:
Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent’s condition or conduct in the near future, considering the child’s age and his need for a safe, stable, and permanent home.

. Proving lack of parental compliance with a case plan is addressed by La. Ch.C. art. 1036(C), which provides:
Under Article 1015(5), lack of parental compliance with a case plan may be evidenced by one or more of the following:
(1) The parent's failure to attend court-approved scheduled visitations with the child.
(2) The parent’s failure to communicate with the child.
(3) The parent’s failure to keep the department apprised of the parent’s whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.
(4) The parent’s failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.
(5) The parent’s repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.
(6) The parent’s lack of substantial improvement in redressing the problems preventing reunification.
(7) The persistence of conditions that led to removal or similar potentially harmful conditions.

. Proving lack of reasonable expectation of significant parental improvement is addressed by La. Ch.C. art. 1036(D), which provides:
Under Article 1015(5), lack of any reasonable expectation of significant improvement in the parent’s conduct in the near future may be evidenced by one or more of the following:
(1) Any physical or mental illness, mental deficiency, substance abuse, or chemical dependency that renders the parent unable or incapable of exercising parental respon *747 sibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.
(2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.
(3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

. The Psychologist Report indicates that SH’s past employment included the following: "[s]he was employed for several years as an office manager for Ace Towing Co. and also in the photo department at Walgreens. She has worked as a waitress at several restaurants, most recently at Brennan's several years ago. For about 1 ½ months last year, she assisted her husband [TP] cleaning apartments at the apartment complex where he is employed.”

. On April 1, 2013, SH testified that she and her mother, CM, had an argument regarding CM taking her medication, Suboxone, in front of SH. The paternal grandmother, LG, testified that she received a telephone call from SH after the argument. According to LG, SH told her that her mother, CM, was feeding her the Suboxone that was prescribed for CM. (CM, herself, was attending Fresh Start and taking Suboxone to overcome a prescription medication addiction.) LG further testified that she received a voicemail that day from SH in which SH stated that she was afraid her mother was going to call the law on her. Although SH denied making that statement, the trial court allowed DCFS to play the voi-cemail at trial, establishing that SH had made that statement.

. The paternal grandmother, LG, testified that she did not believe that SH had remained sober since January 2013. According to LG, the reason for her disbelief was the telephone conversation she had with SH on April 1, 2013 in which LG claimed that SH told her that her mother, CM, was feeding her the Suboxone that was prescribed for CM. When asked by the trial court whether she was aware that SH had tested negative for Subox-one, LG replied that she was not. The maternal grandmother, CM, testified that she was certain that SH was currently living drug free. CM also testified that SH had made a complete turnaround, that SH was a very strong woman, and that SH was able to care for the children on her own.

. SH testified at trial that her positive hair screenings possibly were the result of emergency medical treatment that she received during detoxification on an unknown date in January 2013 at an unknown Baton Rouge hospital.

. The Psychologist Report also indicates that SH had an older, third child from a prior marriage. The older child, who was twelve years old, has resided with her biological father since age two. SH reported that she “had regular visitations with her oldest daughter before DCFS’s involvement with the family for the last year.”

. As noted at the outset, the trial court granted the petition to terminate the father's paternal rights, but the father did not appeal.

. See State in Interest of C.A.C., 11-1315, p. 7 (La.App. 4 Cir. 2/1/12), 85 So.3d 142, 146 (citing State ex rel. SNW v. Mitchell, 01-2128, p. 10 (La.11/28/01), 800 So.2d 809, 816; and State ex rel. K.G., 02-2886, p. 4 (La.3/18/03), 841 So.2d 759, 762); State ex rel. JT v. J.M., 46,090, pp. 10-11 (La.App. 2 Cir. 12/12/10), 56 So.3d 1009, 1013-14; State In Interest of T.J., 48,612, p. 5, n. 17 (La.App. 2 Cir. 9/11/13), 124 So.3d 484, 494, 2013 WL 4854759 (citing State ex rel. J.M., 02-2089, pp. 9-10 (La.1/28/03), 837 So.2d 1247, 1253 (noting that "[t]he finding of best interest of the child is entitled to great deference and is subject to review for manifest error.”)).

. Contrary to the rules of court, DCFS failed to include any assignments of error in its brief. See Uniform Rules, Courts of Appeal, Rule 1-3 (providing that ”[t]he Courts of Appeal will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise”); see also Uniform Rules, Courts of Appeal, Rule 2-12.4 (requiring that the appellant’s brief include "a specification or assignment of alleged errors relied upon"). DCFS did include in its Motion for Appeal the following allegation: ”[t]he trial court erred in denying the petition for termination of parental rights as to the mother, as the grounds were proven, the evidence of post-filing rehabilitation efforts was improperly admitted and/or was insufficient, and freeing the children for adoption by their long term caretaker is in their best interests.” Insofar as the evidentiary issue noted in the motion for appeal, which is not raised in DCFS’ appellant brief, this court has held that there is “no jurisprudential or statutory support for the State's contention that the mother's post-petition improvements are irrelevant and should not have been considered by the trial court.” State ex rel. S.L.W., 06-1560, p. 5 (La.App. 4 Cir. 4/18/07), 958 So.2d 53, 56.

. DCFS contends that the trial court erred in failing to find that it proved the ground for abandonment for nonsupport given that "neither parent paid child support for more than sixteen months and the mother did not establish just cause for her failure.”

. DCFS contends that the trial court erred in failing to find that it proved the ground of failure to comply with a case plan given that SH "did little or nothing to start or complete her case plan or make significant improvements necessary for the safe return of [her] children until three weeks before trial.” In support, DCFS cites the following factors;
• The mother had done absolutely nothing on her case plan from June 2011 through Januaiy 2013;
• The trial was recessed in October of 2013 and resumed in May of 2013 to give the mother another opportunity to complete a case plan, yet she did very little until April 2013 when she split with the father;
• The mother did not immediately and actively enroll in aftercare when she left inpatient treatment in February 2013, continued to have positive hair tests for opiates in April and May of 2013, and admitted to using drugs and alcohol in April of 2013;
• At trial, the mother did not have a job, had completed only 5 of 16 parenting classes, and had not started any of the treatment recommended by the psychological evaluation that she delayed completing for twenty three months; and
• The children had been in foster care for nearly two years by the time of the conclusion of the trial.

. DCFS contends that the trial court’s own comments establish that it erred in failing to find that the mother could not make significant improvements for the safe and stable return of the children in the near future. Particularly, DCFS cites the trial court's comments that the mother "had a long way to go” and that it did not know if she was strong or serious enough.

. DCFS also cites State in Interest of S.D. v. Moore, 31,192, p. 3 (La.App. 2 Cir. 8/19/98), 717 So.2d 265, 267, which stated that "[i]f grounds for termination as set forth in Article 1015 are proved, then ordinarily termination will be in the best interests of the children; however, the best interest determination allows the court in an exceptional case, to refuse to terminate, even after proof of article 1015 grounds.” See also Official Comments to La. Ch.C. art. 1037 (noting that ”[o]nly in the exceptional case would a court be authorized to refuse termination as not serving the child’s needs when a ground authorized by Art. 1015 has been proved in the hearing.”).

. DCFS also suggests that the trial court terminated the father’s parental rights on almost the same evidence that it refused to terminate the mother’s parental rights. This suggestion is belied by the record. Unlike the mother, the father failed to appear at trial. In October 2012, the trial court warned that if the parents failed to appear for the completion of the trial, it would terminate their parental rights.

. At trial, the DCFS case manager, Ms. Robertson, testified that despite SH’s recent attempts at completing the case plan, DCFS’ recommendation was that the children be freed for adoption. Ms. Robertson explained that the reason for the DCFS’ recommendation was the time frame — the children had been in state custody for almost two years, and neither parent has made substantial progress on their case plan.

. La. Ch.C. art. 1004.1 provides that ”[t]he department shall file and pursue to judgment in the trial court a petition to terminate the parental rights of the parent or parents if the child has been in state custody for seventeen of the last twenty-two months, unless the department has documented in the case plan a compelling reason why filing is not in the best interests of the child.”

. La. Ch.C. art. 1032 provides: ”[u]pon a showing of good cause and notice to the opposing party, the court may grant, deny, or restrict a requested continuance of the proceeding. The court shall avoid delays in resolving the status of the parent and in achieving permanency for the child.”

. The trial court in State ex rel. S.L.W., 06-1560, pp. 5-6 (La.App. 4 Cir. 4/18/07), 958 So.2d 53, 67, made the following factual findings:
[The] evidence in this matter established that there is, indeed, a reasonable expectation of significant improvement in [the mother's] condition or conduct in the near future. In fact, she has improved tremendously and has been drug free for an extended period of time. She has a job and a place to live, and there is no evidence in this matter that her children don’t love her and want to live with her.
In fact, the evidence establishes that, based on poverty [the mother] left her children with relatives; that she has a history of drug abuse; that all of the steps set forth in the case plan for reunification were contingent on her being drug free; that she has *758 repeatedly and consistently attempted drug and mental-health counseling, always on a voluntary basis; that she has occasionally relapsed; that she has never indicated an intention of abandoning her children; and has now completed an in-patient substance abuse program, is drug-free; and has a job and a place to live in a supportive environment. Finally, there is no evidence that terminating her rights would be in the best interests of these children. As such, the petition is denied as to [the mother].

. In In Interest of Boudreaux, 427 So.2d 891 (La.App. 1st Cir.1983), unlike in this case, the trial court terminated the parental rights; and the appellate court, after reviewing the record, affirmed the trial court's best interest determination. DCFS’s reliance on the Bou-dreaux case is thus misplaced.
Likewise, DCFS' reliance on State in Interest of A.M., 12-0799 (La.6/15/12), 90 So.3d 1029, is misplaced. SH has no obstacle, such as current incarceration, that renders the formulation of additional case plans to give her additional time contrary to her children's best interest. In contrast, in AM., supra, the Louisiana Supreme Court, in a per curiam, held:
Based on our review of the record, and considering the unique circumstances of this case, we conclude relator produced sufficient evidence to establish that C.M. and S.M. failed to substantially comply with their case plans for purposes of La. Ch. Code art. 1015(5). In light of the parents’ history of limited compliance with their case plans, and given their current incarcerated status, we find the formulation of additional case plans would not further the goal of reunification, and would result in the children remaining in foster care for an indefinite period of time, contrary to their best interest. See State ex rel. J.M., 02-2089, p. 9 (La.1/28/03), 837 So.2d 1247, 1257 ("[forcing children to remain in foster care indefinitely, when there is no hope of reuniting them with their families, runs afoul of the state and federal mandates to further the best interest of the child”).
12-0799 at p. 1, 90 So.3d at 1029.

. State ex rel. J.A., 99-2905, p. 9 (La.1/12/00), 752 So.2d 806, 811.

. In the Psychologist Report, it is noted that SH informed the psychologist that the "children’s paternal grandmother has kept her children from her since she successfully completed inpatient treatment and no longer lives in her [the paternal grandmother's] home.”

. Cf. State in Interest of J.M.L., 47,201, 47,202, p. 12 (La.App. 2 Cir. 4/11/12), 92 So.3d 447, 453 (citing expert's testimony in support of affirming trial court’s finding that it was in the children's best interest to terminate parental rights).

. La. Ch.C. art. 1034(C) provides:
If competent, the child may be heard on his own behalf. Any testimony given by a child may be taken by a videotaped interview or by closed circuit television, as authorized by Title 3, Chapter 8 of this Code, or by an in-chambers conference attended only by the judge and court reporter and by counsel for the child, for the petitioner, and for the parents.