ROSEMARY LEDET, Judge.
 

 | ,This is an involuntary termination of parental rights case. From a judgment terminating the parental rights of the biological father, John C, of a female child, CAC, based on abandonment under La. Ch.C. art. 1015(4), the father appeals.
 
 [1]
 
 For the reasons that follow, we reverse.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 On October 7, 2007, CAC was born. Her birth certificate designated John C as her father and Christi P as her mother. During the first ten months of her life, CAC was cared for by both her parents, who never married. During this period, John C acknowledged that he was addicted to heroin.
 

 In August 2008, John C was arrested on federal charges of possession of heroin and assault. Ultimately, he was sentenced on those charges to thirty-six months. Until he was sentenced, John C was incarcerated in New Orleans. When he was sentenced, he was moved to a federal prison in Beaumont, Texas. The record, however, is unclear as to exactly when he was moved to Beaumont. The | ¿record reflects that he was incarcerated in New Orleans at least until February 2010, when the case manager (Tory Dixon) attempted to visit him in jail to give him the statutorily required notice; and he was moved to Beaumont sometime before June 2010, when he wrote to the trial judge in this case.
 

 In January 2011, John C was released from federal prison and moved to a halfway house in New Orleans. In March 2011, he was released from the halfway house and moved into his father’s (George C, Sr.’s) house. At the time of the trial in this matter, John C was still on federal probation.
 

 During John C’s incarceration, the State of Louisiana, Department of Social Services, Office of Community Services, now called the Department of Children and Family Services (“DCFS”) received three complaints regarding the neglect of CAC. The primary basis for the complaints was the mother’s (Christi P’s) drug abuse and the father’s (John C’s) absence due to his incarceration, resulting in the lack of a caregiver for the child. Following the third complaint, the DCFS requested and was granted custody of CAC on January 26, 2010.
 
 [2]
 
 CAC was placed in foster care
 
 *144
 
 with her paternal aunt and uncle (Heather C and George C, Jr.) with whom she was residing before the DCFS obtained custody. Indeed, Heather C and George C, Jr., cared for CAC for two prior periods: (i) in August 2009 for about three and a half weeks while Christi P was in drug treatment; and (ii) from November 2009, when Christi P overdosed, through January 2010, when CAC was officially placed in state custody.
 

 |sAs noted above, in February 2010, Ms. Dixon attempted to visit John C in prison in New Orleans. The purpose of her visit was to deliver to him the notice the DCFS is required by La. Ch.C. art. 1036.2 to give an incarcerated parent of a child placed in state custody (foster care).
 
 [3]
 
 After making two unsuccessful attempts to visit John C in jail, Ms. Dixon opted to give the notice to John C’s attorney in this case, Alan Bouterie, to give to John C.
 

 In April 2010, an adjudication hearing was held; and CAC was found to be a child in need of care. Mr. Bouterie attended the hearing and represented that “he could not speak with his client (in jail)”; however, he reserved John C’s rights.
 

 As noted above, in June 2010, the trial judge received a letter from John C, who was then incarcerated in Beaumont. In the letter, John C requested permission for one of his parents to bring CAC to visit him. He also informed the judge that |4the child protection case involving CAC was opened after he was incarcerated. He further informed the judge that he was told a lawyer was appointed for him in the case, but he was never contacted by one. He added that even when he was in jail in New Orleans waiting to be sentenced he was never contacted by a lawyer regarding the case. He also noted that he did not know what his rights were.
 

 In July 2010, the trial judge forwarded John C’s letter to the indigent defense office. In his forwarding letter, the judge noted that Mr. Bouterie, the lawyer initially appointed to represent John C in this
 
 *145
 
 case, was no longer with the office. Also in July 2010, John C wrote the judge a second time. He again requested permission for CAC to visit him and again informed the judge that although he was supposed to have an appointed lawyer in the case he was never contacted by one.
 

 In September 2010, Alyndra Stalbert, the case manager who took Ms. Dixon’s place while she was on maternity leave, mailed the Article 1036.2 notice to John C. Along with the notice, she included a copy of the case plan. Ms. Stalbert obtained John C’s address from his brother (George C, Jr.). Five days after receiving the notice and case plan, John C sent a reply letter to Ms. Stalbert. Included with his reply letter was the OCS Form TPR-2 Notice of Termination of Parental Right Law, which he signed and dated September 20, 2010. In his reply letter, John C noted that in reading the case plan he noticed it required him to pay twenty-five dollars a month in child support. He further noted that he was working in federal prison and earning seventeen dollars a month. He offered to send his monthly check and requested instructions on where he should send the money.
 

 |sIn November 2010, a review hearing was held at which the court, following the ease plan, indicated that the goal for CAC was reunification with her parents. Also in November 2010, John C wrote a letter to Ms. Dixon, who had returned from maternity leave and was again the case manager, indicating that he had received a letter from her regarding the November 2010 hearing. He requested permission from her for CAC to visit him at least once during the upcoming holidays.
 

 On January 13, 2011, another review hearing was held. At this hearing, the court approved the change of the goal for CAC from reunification to adoption.
 

 On January 26, 2011, exactly one year after CAC was officially placed in state custody, the DCFS commenced this case against both parents, John C and Christi P, seeking to terminate their parental rights and to free CAC for adoption. In the petition, the DCFS alleged that termination was appropriate based on La. Ch.C. art. 1015(4),
 
 [4]
 
 abandonment.
 
 [5]
 
 In support, the DCFS alleged that as of the filing of the petition both parents had not provided significant support; and the | (¡father had failed to maintain significant contact for six consecutive months beginning on January 26, 2010. As to support, the petition alleged that John C did not pay any child support, did not pay for educational supplies, health insurance, or medical bills for the child; and did not provide food, clothing, or other necessities for the child. The petition averred that “the mother [Christi P] paid one payment of $25.00 in the year that the child has been in foster care.” As to contacts, the petition alleged that the
 
 *146
 
 father, John C, failed to maintain significant contact with the child; particularly, the DCFS averred that the father failed to send cards, letters, photographs, or gifts; failed to participate in planning for the child; and failed to maintain contact in person, by phone, or in writing.
 

 In February 2011, Christi P voluntarily surrendered her parental rights to CAC. At a hearing in March 2011, the trial court recognized Christi P’s voluntary surrender of her parental rights. Thus, only the parental rights of the father, John C were tried and are at issue on appeal.
 

 In June 2011, a one-day trial was held on the termination of John C’s parental rights. The following six witnesses testified at the trial: John C; John C’s father, George C, Sr.; John C’s sister-in-law, Heather C; John C’s brother, George C, Jr.; and the two case managers, Ms. Dixon and Ms. Stalbert. Following the trial, the court took the matter under advisement.
 

 In July 2011, the trial court rendered judgment terminating John C’s parental rights based on abandonment due to nonsupport. This appeal followed.
 

 \ .DISCUSSION
 

 A trial court’s findings on factually-intense termination of parental rights issues are governed by the manifest error standard of review.
 
 State ex rel. SNW v. Mitchell,
 
 01-2128, p. 10 (La.11/28/01), 800 So.2d 809, 816;
 
 State ex rel. K.G.,
 
 02-2886, p. 4 (La.3/18/03), 841 So.2d 759, 762. In an involuntarily termination of parental rights case, courts must balance the often competing interests of the natural parent and the child.
 
 Mitchell,
 
 01-2128 at p. 8, 800 So.2d at 814-15. The child has an interest in terminating parental rights that preclude or delay adoption and inhibit establishing stable, long-term family relationships.
 
 State ex rel. G.J.L.,
 
 00-3278, p. 6 (La.6/29/01), 791 So.2d 80, 86. Natural parents have a fundamental liberty interest in the care, custody, and management of their child that ‘“does not evaporate simply because they have not been model parents.’ ”
 
 Mitchell,
 
 01-2128 at p. 8, 800 So.2d at 814 (quoting
 
 Santosky v. Kramer,
 
 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606 (1982)). Congruent with the parent’s interest, the State has an interest in terminating parental rights under certain circumstances.
 
 State in the Interest of A.C.,
 
 93-1125, pp. 9-10 (La.10/17/94), 643 So.2d 743, 748 (citing La. Ch.C. arts. 1004 and 1015).
 

 The permanent termination of the parent-child legal relationship is one of the most drastic actions the State can take against its citizens.
 
 State ex rel. AT.,
 
 06-0501, p. 4 (La.7/6/06), 936 So.2d 79, 82. As noted above, natural parents have a fundamental liberty interest in maintaining their legal relationship with their child. When the State seeks to terminate the relationship, due process requires that a | ^fundamentally fair procedure be followed.
 
 In re State ex rel. D.C.P.,
 
 05-212, p. 7 (La.App. 5 Cir. 10/6/05), 916 So.2d 1206, 1209. For these reasons, the Louisiana Legislature has imposed strict procedural and evidentiary requirements that must be met before the relationship can be terminated.
 
 See SNW, supra.
 

 Eight statutory grounds for the involuntary termination of parental rights are enumerated in La. Ch.C. art. 1015. Although the State need only establish one statutory ground, the trial court must also find that termination is in the child’s best interest. La. Ch.C. arts. 1015 and 1039. Moreover, given the draconian nature of an involuntary termination proceeding, the State is required to prove the statutory ground on which it relies by clear and convincing evidence. La. Ch.C. art. 1035 A;
 
 Mitchell,
 
 01-2128 at p. 10, 800 So.2d at
 
 *147
 
 816. To satisfy the onerous clear and convincing standard, the State must establish that the parent’s failure to comply with the statutory ground is highly probable.
 
 State in the Interest of Q.P.,
 
 94-609, p. 4 (La.App. 3 Cir. 11/2/94), 649 So.2d 512, 515.
 

 Summarizing, involuntary termination of parental rights is a two-pronged inquiry. First, the State must prove by clear and convincing evidence the existence of at least one of the eight statutory grounds for termination under La. Ch.C. art. 1015. Second, but only after the ground for termination is found, the trial court must determine whether the termination is in the child’s best interest. La. Ch.C. art. 1039;
 
 State ex rel. L.B. v. G.B.B.,
 
 02-1715, pp. 5-6 (La.12/4/02), 831 So.2d 918, 922.
 

 |flTurning to the instant case, John C contends on appeal that the trial court erred in three respects: (i) finding the State satisfied the onerous burden of proving a ground of termination by clear and convincing evidence; (ii) terminating his parental rights by considering only the best interest of the child; and (iii) terminating his parental rights despite the State’s failure to make timely and reasonable efforts to notify him of CAC’s placement in the state’s custody as required under La. Ch. C. art. 1036.2(B).
 

 In terminating John C’s parental rights, the trial court relied solely on Article 1015(4)(b), abandonment based on six months of nonsupport. In its reasons for judgment, the trial court found that termination was in CAC’s best interest and that John C “has not supported his daughter.” The court reasoned that “what little assets he had (from the sale of a truck) while in jail could have been used to support the child, but were instead used on himself and given to other family members.” Labeling John C’s failure to direct the proceeds from the sale of the truck be used to support CAC as neglect, the trial court found the requirement for establishing abandonment based on six consecutive months of nonsupport was satisfied.
 

 Factually, the trial court’s reasons are supported by the record. At trial, John C testified that when he was incarcerated he owned a truck, which was his sole asset. According to John C, he directed his father, George C, Sr., to sell the truck and to use the money for whatever John C needed for CAC. John C’s father, George C, Sr., testified that he sold the truck for $5,000 to his brother. (George C, Sr., was unclear as to exactly when during John C’s incarceration he sold the |intruck.) After he deducted about $1,000 for the costs of repairs, George C, Sr., gave some of the money to John C’s sister as John C directed. George C, Sr., used some of the money for his own needs, again as John C directed, and sent some of the money to John C for things he needed during the time that he was incarcerated. Although George C, Sr., acknowledged that George C, Jr., and Heather C took care of CAC’s needs, he did not use any of from the money from the sale of the truck to pay them regular support for CAC. Rather, George C, Sr., used some of the money to buy CAC dresses and other items for visits with her father, John C, when he was in jail in New Orleans. It is undisputed that John C made no other financial contributions to CAC’s support during his incarceration.
 

 The jurisprudence has held that sporadic gift-giving — such as John C’s father made on his behalf — does not amount to significant support.
 
 See In re TMS,
 
 08-810, p. 6 (La.App. 3 Cir. 11/5/08), 999 So.2d 21, 26 (collecting cases). Nonetheless, the trial court legally erred in terminating John C’s parental rights based on abandonment. The legal error stems from the
 
 *148
 
 determination of the date on which the abandonment period under La. Ch.C. art. 1015(4) commenced.
 

 In finding John C abandoned CAC, the trial court apparently assumed that the period for determining abandonment under Article 1015(4) commenced on the date that CAC officially was placed in state custody (foster care), January 26, 2010. In its petition, the DCFS alleged that the abandonment period commenced on that date. However, the DCFS in its brief acknowledged that the abandonment period may have commenced at a later date; it stated: “[w]hen the child was no |nlonger placed with a parent and when [John C] knew or should have known that C.A.C. was in foster care, the time frame for Children’s Code Art. 1015(4) began.” The DCFS’s reliance on when John C should have known that CAC was in foster care is misplaced. To meet its onerous burden, the DCFS was required to establish the incarcerated parent had actual notice of his child’s placement in state custody (foster care) to commence the six month abandonment period.
 

 A similar issue regarding the commencement of the six month period for calculating the abandonment period under La. Ch.C. art. 1015(4) was addressed in
 
 State ex rel. D.H.L.,
 
 08-89 (La.App. 3 Cir. 4/30/08), 981 So.2d 906. In that case, the trial court’s reasons for judgment indicated that the six month period that D.B. neither supported nor contacted D.H.L. was from April 2004 through December 2004. Although D.B. acknowledged that he did not begin to pay child support for D.H.L. until January 2005, the DNA test results proving that he was D.H.L.’s biological father were not received until October 2004. The appellate court found that the trial court legally erred in holding D.B. legally responsible for the support of D.H.L. before his paternity was established. The appellate court reasoned that “[t]he trial court’s reliance upon this six month period to conclude that the State had proven by clear and convincing evidence that D.B. had abandoned D.H.L. pursuant to La.Ch.Code art. 1015, sections (4) and (5) was legally incorrect.”
 
 D.H.L.,
 
 08-39 at p. 6, 981 So.2d at 910. The six month period thus could not commence until D.B.’s paternity was established.
 

 | ^Likewise, we conclude that the six month period in this case could not commence until the DCFS established that John C had actual notice that CAC was placed in state custody. It is undisputed, as John C emphasizes, that the DCFS failed to comply with the requirement of Article 1036.2(B) that “[wjithin thirty days of notification that a parent of a child in foster care is incarcerated in this state, a representative of the department shall visit the incarcerated parent and give written notification to the incarcerated parent of his duty to provide a reasonable plan for the appropriate care of the child.” Although CAC officially was placed in foster care with her paternal aunt and uncle in January 2010, the DCFS did not give written notice to John C until nine months later, September 2010, when it was mailed to him.
 

 The DCFS contends that the requirement of giving notice under La. Ch.C. art. 1036.2 is only relevant in an involuntary termination proceeding under La. Ch.C. art. 1015(B)(6), extended incarceration period.
 
 [6]
 
 Since the instant case was brought
 
 *149
 
 under La. Ch.C. art. 1015(B)(4), abandonment, the DCFS contends that its failure to comply with the statutory requirement regarding given notice is irrelevant. We disagree. The DCFS’s failure to comply with the statutory requirement of giving notice to the incarcerated parent is relevant in this case in | ^determining the commencement of the six month abandonment period under Article 1015(4).
 

 Ms. Dixon testified that in February 2010 she gave the Article 1036.2 notice to John C’s attorney, Mr. Bouterie. However, John C in his letters to the trial judge dated June and July 2010 stated that the attorney appointed to represent him in this case had not contacted him. At trial, John C was asked whether his father informed him when CAC was placed in foster care (state custody). He replied that he was “aware of some of the stuff, but my dad is in the middle of the situation here because my daughter was with my brother. So my dad is not going to tell me everything that’s going on.” John C’s further testified that he was not fully aware of the situation. The record thus does not support a finding that John C had actual notice that CAC was placed in state custody (foster care) until September 2010 when he received the Article 1036.2 notice and a copy of his case plan.
 

 Although the obligation of a parent to support his child is distinct from a court ordered obligation to pay child support, the cases in which termination has been ordered based on a failure to support have involved “the parent’s failure to voluntarily pay support or make specified support payments called for in the case plan.”
 
 State ex rel. B.H. v. A.H.,
 
 42,864, pp. 10-11 (La.App. 2 Cir. 10/24/07), 968 So.2d 881, 888 (collecting cases). John C was not provided a copy of his case plan ordering him to pay twenty-five dollars a month in child support until September 2010, less than six months before the filing of the termination petition.
 
 [7]
 
 It | ^therefore cannot be concluded that he failed to pay child support pursuant to the case plan for a consecutive six month period before the filing of the petition.
 

 In summary, the trial court legally erred in relying on a six month period commencing before John C received actual notice of CAC’s placement in state custody (foster care) and before he was provided a copy of his case plan. It would be fundamentally unfair to find a failure to support based on a period during which John C was not notified that his child had been placed into state custody and that he had an obligation to pay child support. Accordingly, the trial court erred in finding the DCFS satisfied its onerous burden of proving abandonment under La. Ch.C. art. 1015(4)(b).
 

 The trial court in its reasons for judgment did not address the issue of whether the DCFS established abandonment based on La. Ch.C. art. 1015(4)(c)— lack of contact. This ground would be subject to the same hurdle, discussed above, regarding the commencement of the six month period for abandonment.
 
 See
 
 
 *150
 

 D.H.L., supra.
 
 Regardless, the record would not support a finding of abandonment under La. Ch.C. art. 1015(4)(c) based on lack of contact during the time that John C was incarcerated — between August 2008 and January 2011. During that time, John C made the following significant efforts to keep in touch with CAC:
 

 • When he was incarcerated in New Orleans, his father, George Clark, Sr., brought CAC to see him almost every week until January 2010. John C also talked to CAC on the phone.
 

 | is* When he was incarcerated in Beaumont, John C talked to CAC on the phone through his father (George C, Sr.) or CAC’s mother (Christi P). He explained that he knew when the mother had visits with CAC, and he would call during that time. Also, he would call his father when his father was at his brother’s house.
 

 • John C sent cards to his father for CAC; he did not send cards directly to his brother’s house because he was afraid that CAC would not receive them.
 

 • John C wrote letters to the trial judge and the case manager requesting permission for CAC to visit him.
 

 • On the day he was released from prison, John C called the case manager, Ms. Dixon, to find out what he needed to do to see CAC.
 

 John C was released from prison the same month the termination petition was filed, January 2011. Since his release John C has attended visitation with the child. Thus, the record would not support a finding of abandonment based on John C’s lack of contact with CAC during his incarceration.
 

 Accordingly, we reverse the trial court’s decision terminating John C’s parental rights. In the event John C fails to fulfill his parental obligations, the DCFS, in its discretion, may institute another proceeding to terminate his parental rights.
 

 DECREE
 

 For the forgoing reasons, the judgment of the trial court is reversed.
 

 REVERSED
 

 [1]
 

 . Because this is a juvenile matter, the initials of the last name of the parties are used in lieu of their full names to protect the privacy of the parties. Likewise, the initials of the minor child are used in accordance with Uniform Rules — Courts of Appeal, Rule 5-2.
 
 See also
 
 Uniform Rules — Courts of Appeal, Rule 5-1.
 

 [2]
 

 . The mother, Christi P, had another younger child with another man. The other child also
 
 *144
 
 was removed from the home and separately placed. The other child is not at issue on this appeal.
 

 [3]
 

 . Article 1036.2 provides as follows:
 

 A. An incarcerated parent of a child in the custody of the department shall provide a reasonable plan for the appropriate care of his child other than foster care. Failure by the incarcerated parent to provide an appropriate plan may result in an action to terminate his parental rights.
 

 B. Within thirty days of notification that a parent of a child in foster care is incarcerated in this state, a representative of the department shall visit the incarcerated parent and give written notification to the incarcerated parent of his duty to provide a reasonable plan for the appropriate care of the child. The department, at that time, shall obtain information regarding the plan, including the names, addresses, cellular numbers, telephone numbers, and other contact information of every potential suitable alternative caregiver.
 

 C. The incarcerated parent shall provide the department with the required information in writing within sixty days of receipt of the notification form. During that period, a parent may submit additional information or names of other caregivers using the form attached to the notice. The department shall provide the parent with a stamped, self-addressed envelope for this purpose. No additional caregiver names will be accepted after the expiration of the sixty-day period, as evidenced by a postmark.
 

 D. The department shall conduct an assessment of the persons named as caregivers by the incarcerated parent and shall notify the parent within ten days of completion of the assessment whether the persons named are willing and able to offer a wholesome and stable environment for the child.
 

 La. Ch.C. art. 1036.2. Subsection E of the article provides an example of the form that the notification must substantially follow.
 

 [4]
 

 . Article 1015(4) provides that termination is appropriate based on a parent’s:
 

 (4) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
 

 [[Image here]]
 

 (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
 

 (c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.
 

 La. Ch.C. art. 1015(4).
 

 [5]
 

 . Although the DCFS also alleged in the petition that termination was also appropriate based on La. Ch.C. art. 1015(5), failure to comply with the case plan, it did not pursue this ground at trial.
 

 [6]
 

 . Article 1015(B)(6) provides:
 

 The child is in the custody of the department pursuant to a court order or placement by the parent; the parent has been convicted and sentenced to a period of incarceration of such duration that the parent will not be able to care for the child for an extended period of time, considering the
 
 *149
 
 child's age and his need for a safe, stable, and permanent home; and despite notice by the department, the parent has refused or failed to provide a reasonable plan for the appropriate care of the child other than foster care.
 

 La. Ch.C. art. 1015(B)(6).
 

 [7]
 

 . This is not a case in which an incarcerated parent sought to use his incarceration as an excuse for nonsupport.
 
 See State ex rel. C.M.O.,
 
 04-1780, p. 4 (La.App. 4 Cir. 4/13/05), 901 So.2d 1168, 1171 (holding that a parent’s responsibility to support his children is not suspended upon his incarceration and that imprisonment cannot be used as an excuse to escape parental obligations);
 
 see also State in the Interest of K.T.,
 
 02-2009 (La.App. 4 Cir. 2/21/03), 841 So.2d 67.