# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 18-641

**STATE IN THE INTEREST OF**

**I. A.**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. JC2017-706
HONORABLE THOMAS R. DUPLANTIER, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## SHANNON J. GREMILLION
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Sylvia R. Cooks, Shannon J. Gremillion, and D. Kent Savoie, Judges.

**Cooks, J., Concurs and assigns written reasons.**

**AFFIRMED.**

**Jami Pellerin**
**Public Defender's Office**
**Fifteenth Judicial District Court**
**600 Jefferson Street, Suite 902**
**P.O. Box 3602**
**Lafayette, LA 70502**
**(337) 889-5676**
**COUNSEL FOR APPELLANT:**
    **In. A. (mother)**

**Tracey Davenport-McGraw**
**Assistant District Attorney**
**Fifteenth Judicial District Court**
**P. O. Box 3306**
**Lafayette, LA 70502**
**(337) 232-5170**
**COUNSEL FOR OTHER APPELLEE:**
     **State of Louisiana**

**Alexander Hurd**
**Acadiana Legal Services**
**P.O. Box 4823**
**Lafayette, LA 70501**
**(337) 365-4006**
**COUNSEL FOR OTHER APPELLEE:**
     **I. A. (child)**

**CASA Coordinator**
**c/o CASA of SoLa**
**227 La Rue France**
**Lafayette, LA 70508**
**(337) 268-5111**
**OTHER APPELLEE:**
     **CASA of SOLA**

**Reneisha Stewart**
**Department of Children and Family Services**
**100 Asma Blvd Ste 260**
**Lafayette, LA 70508**
**(337) 261-5901**
**OTHER APPELLEE:**
     **Department of Children and FamilyServices**

**Lloyd Dangerfield**
**Attorney at Law**
**703 E. University Ave.**
**Lafayette, LA 70503**
**(337) 232-7041**
**COUNSEL FOR OTHER APPELLEE:**
     **Donald Griffen**

**GREMILLION, Judge.**

In.A., the mother of I.A., appeals the judgment of the trial court maintaining I.A. in the custody of the State of Louisiana with the goal of placing I.A. for adoption.[1]  For the reasons that follow, we affirm.

**FACTS**

On August 2, 2017, In.A. was placed in the custody of the Department of Children and Family Services (DCFS) after allegations were made that she had been sexually abused.  She was eleven years old.  She complained of stomach pain while in DCFS custody and was taken to a nearby hospital, where personnel ascertained that In.A. was thirty-two weeks pregnant.  I.A. was born on September 15, 2017.  The trial court issued an instanter order placing I.A. into DCFS custody, and he and In.A. were placed at Lighthouse Ministries, a shelter for adolescent mothers and children.  I.A. was adjudicated a Child in Need of Care (CINC) in January 2018.

At Lighthouse, In.A. exhibited defiant behavior.  In.A. did receive parenting instruction at Lighthouse, but those lessons seem to have not been absorbed.  There surfaced other concerns as well, which led the facility to request that I.A. and In.A. be placed elsewhere.  According to the testimony of In.A.'s case worker, Ms. Reneisha Stewart, I.A. was moved to a foster home on March 20, 2018, because of "incident reports that were happening between [I.A.] and [In.A.] and the home felt that it was a liability on them and they didn't want anything to happen to [I.A.]"  In.A. was also moved to a different facility in Baker, Louisiana.  Thereafter, In.A. saw I.A. every other week during supervised visits at either the DCFS facility in Lafayette or at a park near the Lafayette DCFS facility.  I.A. was appointed a Court

---

[1] In accordance with Uniform Rules—Courts of Appeal, Rule 5.2, the initials of the minors are used to preserve their confidentiality.

Appointed Special Advocate (CASA) volunteer, who also attended the bi-monthly visits.

In.A. was subject to a DCFS plan with the goal of reunifying her with I.A., but "her behavior problems as well as her not willing to listen to the instructors who were trying to help her parent her child" resulted in In.A. not progressing satisfactorily in this plan, according to Ms. Stewart. Her defiance, Ms. Stewart testified, had even progressed to physical aggression against the staff of the home. After nine months, DCFS sought approval to maintain I.A. in its custody but to change the goal of the plan from reunification to adoption. This plan was submitted on June 13, 2018.

A hearing on this change in I.A.'s plan was held on June 26, 2018. At the hearing, Ms. Stewart testified to the above facts. Her testimony indicated that In.A. had problems maintaining an orderly room. According to information Ms. Stewart received from her foster caretakers, In.A. resorts to destructive tantrums when not given her way. Ms. Stewart also testified to difficulties In.A. had in following the instructions of the foster caretakers regarding her own personal hygiene. In.A.'s rough play with I.A., that resulted in a minor "bump" on his head, was of deep concern for Ms. Stewart. Daycare workers also reported to Ms. Stewart that, following a family visit, I.A. presented with scratches on his abdomen.

The report of the CASA volunteer indicated, in pertinent part:

[In.A.] has shown herself to be incapable of properly caring for her baby for an ongoing time. Information gathered by CASA, from the DCFS case files, states that Dr Pappaspyrus, child psychiatrist, diagnosed [In.A.] (at age 8) with Oppositional Defiance Disorder. In February 2018, Dr Brennan, child psychologist, has expressed her concerns in regard to [In.A.]'s behavior toward [I.A.]. There have been reports from [In.A.]'s caregivers of her behaving in violent and aggressive ways. She has had trouble maintaining her own personal hygiene. According to reports, [In.A.] will never be capable of living on her own, caring for her child without a primary caregiver, or holding a job. She attends elementary school in a special education classroom.

She is currently living at Provisions Residential Care in Baker, LA. In a conversation with staff members on [In.A.]'s progress, it was reported that [In.A.] struggles with hygiene, care of her belongings and proper interactive behavior. She does have some good days. [In.A.] is going to summer school to catch up on lessons, so that she will be ready for 7th grade. Ms[.] Keisha Roberson informed CASA that [In.A.] does have a long way to go with her progress and is very immature for her age, also saying that some things will never be possible for [In.A.] because of her low IQ.

CASA has observed and/or interacted in four different family visits (9.5). [In.A.] invariably shows brief and intermittent interest in [I.A.] and then moves on to her own interests. She demonstrates that she is not aware of [I.A.]'s needs and wants at any given moment and is only concerned with her own interests. She does not show any ability or even desire to care for him for more than a few moments at any given time. [In.A.] gives most of her attention to her mother, [V.A.], to her phone, and to photos or other belongings brought to visits. She often defers to another adult when someone indicates that [I.A.] is in need of some attention. When she does have him, she demonstrates lack of understanding of basic care for him. At one visit, she wanted to give [I.A.] a french fry "because he has three teeth". No family member objected, so CASA advised her that he was too young for this food and that it could cause him to choke. According to Reneisha, DCFS caseworker, she later 'snuck' the french fry to him anyway. When family visits are set at the park, CASA must interact when necessary, such as when [In.A.] or the 8-year-old half sister brings [I.A.] to a baby swing or when someone is trying to feed him things not meant for a baby. No family member has ever brought an age appropriate toy for [I.A.] to a visit.

The CASA volunteer recommended that DCFS change the goal for I.A. from reunification to adoption. The CASA volunteer, however, did not testify at the hearing.

At the close of testimony, In.A.'s attorney argued that DCFS had not made reasonable efforts at reunification. Specifically, he argued that In.A. had not been given parenting classes since I.A. was separated from her. He also argued that In.A. had not been given reasonable assistance to manage her trauma and improve her behavior. The trial court found that In.A. was "a twelve (12) year old child trying to be a mother, and that she does not possess the ability to be a mother, based on it's not going to change with parenting skills or anything else." The trial court noted the

lamentable situation this posed but found that adoption was the appropriate disposition to correct it.

An order was entered by the trial court on June 25, 2018. The order did not contain language finding that DCFS's efforts at reunification were reasonable. It did state that the new plan was in I.A.'s best interests. In.A. then perfected this appeal.

## ASSIGNMENTS OF ERROR

In.A. assigns the following as errors:

1. The trial court failed to make any particularized finding regarding the Department's reasonable efforts to reunite In.A. with I.A.

2. A permanency change was not warranted by the evidence presented at the permanency hearing.

3. The Department made no reasonable efforts to reunify In.A. with I.A., so that the trial court's approval of the permanent placement plan of adoption was error.

## DISCUSSION

The permanent disposition of CINC cases by hearing is governed by La.Ch.Code art. 702, which provides, in pertinent part:

> B. The court shall conduct a permanency hearing within nine months after the disposition hearing if the child was removed prior to disposition or within twelve months if the child was removed at disposition, but in no case more than twelve months after the removal. Permanency reviews shall continue to be held at least once every twelve months thereafter until the child is permanently placed or earlier upon motion of a party for good cause shown or on the court's own motion.
>
> C. The court shall determine the permanent plan for the child that is most appropriate and in the best interest of the child in accordance with the following priorities of placement:
>
> (1) Return the child to the legal custody of the parents within a specified time period consistent with the child's age and need for a safe and permanent home. In order for reunification to remain as the permanent plan for the child, the parent must be complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care.
>
> (2) Adoption.
> (3) Placement with a legal guardian.

4

(4) Placement in the legal custody of a relative who is willing and able to offer a safe, wholesome, and stable home for the child.

. . . .

E.  Except as otherwise provided in Article 672.1, the court shall determine whether the department has made reasonable efforts to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health and safety will be the paramount concern in the court's determination of the permanent plan.

We note specifically the language in paragraph (C)(1), which requires that the parent be "complying with the case plan and making significant measurable progress toward achieving its goals and correcting the conditions requiring the child to be in care." While Article 702 establishes a priority of placement, and the main priority is reunification, plan compliance and significant progress are prerequisites to its consideration. As our colleagues on the second circuit stated:

Mere cooperation by a parent is not the sole focus of the evaluation of a permanency plan. Rather, the courts must assess whether the parent has exhibited significant improvement in the particulars that caused the state to remove the children from the parent's care and custody. Stability in the home environment and relationships is a consideration in the permanency plan determination. A parent who professes an intention to exercise his or her parental rights and responsibilities must take some action in furtherance of the intention to avoid having those rights terminated.

*State in Interest of E.M.*, 51,511, p. 10 (La.App. 2 Cir. 6/2/17), 224 So. 3d 1122, 1128.

A plan determination may be reversed only on a finding of manifest error. *Id.* Under the manifest error standard of review, we review the entire record to determine not whether the trial court was right or wrong, but whether the record contains reasonable support for the trial court's findings. *Stobart v. State through Dep't of Transp. & Dev.*, 617 So.2d 880 (La.1993).

5

The trial court found that In.A. was not capable of parenting, and we are unable to hold that this finding constitutes manifest error in any way. The record is clear: In.A, whether by immaturity or mental capacity, shows relative indifference to I.A.'s genuine needs. She plays with him in an inappropriate fashion, attempts to feed him inappropriate food given his developmental stage, and has been witnessed squeezing I.A.'s abdomen and attempting other forms of inappropriate physical contact, and the adults in her life, beyond I.A.'s CASA volunteer, seem unwilling to correct In.A.'s behavior. Further, In.A. has demonstrated in the past that, were those adults to correct her, she would defy that correction. In.A. is a twelve-year-old victim; yet, her minority does not lessen the obligation the law places on her as a parent. *See* La.Civ.Code arts. 221 through 226. In.A. is herself a CINC, and it is difficult to see how one CINC can care for the needs of her CINC child. These facts do not alter the reality, though, that In.A. was not in compliance with her case plan, which eliminated reunification as a potential permanent disposition of I.A.'s matter.

Thus, the only assignment of error we are left to consider is In.A.'s observation that the trial court's order did not find that DCFS had made reasonable efforts at reunification, which, she maintains, is a requirement. Louisiana Children's Code Article 702(E) (emphasis added) provides:

> [T]he court shall determine whether the department has made reasonable efforts to reunify the parent and child *or* to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan. The child's health and safety will be the paramount concern in the court's determination of the permanent plan.

In brief, In.A. omits the use of the disjunctive "or." That use requires that the trial court determine a) whether reasonable efforts to reunify were made, *or* b) whether the department made reasonable efforts to finalize the child's placement in a safe and permanent alternative home. *See* La.R.S. 1:9. A specific finding of reasonable

efforts at reunification, then, is not required in this matter, as the trial court approved the placement of I.A. in a safe and permanent home as the first step toward DCFS taking reasonable steps to such placement. And we note that the trial court had made the determination on March 13, 2018, that DCFS was making a reasonable effort to reunify. Given the steps DCFS took while In.A. and I.A. were housed at Lighthouse, including parenting classes, we are unable to conclude that this was manifestly erroneous.

## CONCLUSION

In.A. was exploited by an adult whose inability to control his baser nature visited lifelong consequences on her. It was the sorry duty of the trial court to attempt to mitigate the harm to I.A.; the wellbeing of I.A. being the paramount consideration for the trial court in this proceeding. The law imposes a heavy burden on parents of any age. That In.A. experiences difficulty in meeting these standards is to be expected. I.A., though, can ill afford to wait for his mother to grow up. He needs stability and care now. The decision of the trial court is affirmed.

**AFFIRMED.**

**INTER-OFFICE MEMO**

| | |
|---|---|
| **TO:** | **Judges Gremillion and Savoie** |
| **FROM:** | **Judge Cooks** |
| **DATE:** | **March 26, 2019** |
| **RE:** | **18-641: State in the interest of I.A.** |
| | **Panel: SJG#1; DKS#2; SRC#3** |

## NUMBER THREE REVIEW

Please see the attached concurring opinion. I concur in the result but for different reasons as more fully set forth in my written concurrence. Judge Gremillion may sign for me and inscribe the opinion as "Cooks, J., Concurs and assigns written reasons."

**STATE IN THE INTERST OF I.A.**

**Cooks, J., Concurs.**

This case is the tragic tale of the rape of an eleven-year-old girl, In.A., by her mother's 42-year-old boyfriend that produced a child, I.A. This situation presents a unique and difficult set of problems for the State Department of Family Services and the courts. Louisiana laws regarding children in need of care were designed to address parental responsibilities of adult people, not of young children forced into parenthood at an unseemly early age. While I agree that the decision of what to do in this case focuses on I.A. and not his young mother, who is also in the State's custody as a child in need of care, I do not agree with the State, the lower court, and the majority's treatment of the relevant laws as though this young mother, herself a victim of a heinous crime, must be gauged by the standards of conduct imposed upon adults of mature age. This mother has suffered unimaginable trauma at the hands of a "mature" adult but has been afforded little to no professional help while in the care and custody of the State. According to the record she has received precious little instruction on parenting I.A. The home she is presently in does not offer parenting courses and none were being provided elsewhere as of the date of the hearing. Worse yet, she receives very little mental health therapy which is undoubtedly needed given the multiple traumas to which she has been subjected and as evidenced by some of her behavior. In my view, the record reflects this mother has largely acted as one might expect a child of such tender years to behave even if she had not been so traumatized by rape and the birth of her baby. The lower court, and the majority here, holds her to the standards of mature adults when weighing her behavior and

1

current fitness for mothering I.A. In my view there is precious little evidence that this mother is incapable of learning to parent her child and she is subjected to platitudes that fit the mold when assessing mature adults who fail to meet the standards imposed on them for acceptable parenting. Our laws designed to provide the framework for assessing the viability of a parent's custody of its child speak only to what we can rightly expect of mature adults. The law failed to take into account this type of tragic circumstance when it imposed the timelines relied on here for this parent to demonstrate her worthiness and ability to "heave to" in convincing the courts that she can properly care for and parent her child. The tragedy that has befallen this little girl through no fault of her own is now to be compounded by the permanent loss of her child. *Never have I seen a more compelling reason to give full force to the law's preference that I.A. be adopted by family rather than strangers, for in this is the only hope that as this mother grows into adulthood she may have an opportunity for some kind of relationship with her son.* The record shows that the trial judge appears to place importance on the law's preference for family members as the adoptive parents and I write to stress the significant importance of this in this circumstance. I write too, because unfortunately this tragedy is one that will be repeated in various ways and will progressively call for a different approach to mothers of immature age and the removal of their children from their lives and vice versa.

In *State in the Interest of J.A.,* 99–2905, pp. 7–9 (La.1/12/00), 752 So.2d 806, 810–11, our supreme court stated:

> In any case to involuntarily terminate parental rights, there are two private interests involved: those of the parents and those of the child. The parents have a natural, fundamental liberty interest to the continuing companionship, care, custody and management of their children warranting great deference and vigilant protection under the law, *Lassiter v. Department of Soc. Servs.,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640

2

(1981), and due process requires that a fundamentally fair procedure be followed when the state seeks to terminate the parent-child legal relationship.

*State in Interest of Delcuze,* 407 So.2d 707 (La.1981).

However, the child has a profound interest, often at odds with those of his parents, in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, and continuous relationships found in a home with proper parental care. *Lehman v. Lycoming County Children's Serv.'s Agency,* 458 U.S. 502, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982); *see also State in the Interest of S.M.,* 98–0922 (La.10/20/98), 719 So.2d 445, 452. In balancing these interests, the courts of this state have consistently found the interest of the child to be paramount over that of the parent. *See, e.g., State in the Interest of A.E.,* 448 So.2d 183, 186 (La.App. 4 Cir.1984); *State in the Interest of Driscoll,* 410 So.2d 255, 258 (La.App. 4 Cir.1982).

The State's *parens patriae* power allows intervention in the parent-child relationship only under serious circumstances, such as where the State seeks the permanent severance of that relationship in an involuntary termination proceeding. The fundamental purpose of involuntary termination proceedings is to provide the greatest possible protection to a child whose parents are unwilling or unable to provide adequate care for his physical, emotional, and mental health needs and adequate rearing by providing an expeditious judicial process for the termination of all parental rights and responsibilities and to achieve permanency and stability for the child. *The focus of an involuntary termination proceeding is not whether the parent should be deprived of custody, but whether it would be in the best interest of the child for all legal relations with the parents to be terminated.* La. Child. CodeE art. 1001. As such, the primary concern of the courts and the State remains to secure the best interest for the child, including termination of parental rights if justifiable grounds exist and are proven. **Nonetheless, courts must proceed with care and caution as the permanent termination of the legal relationship existing between natural parents and the child is one of the most drastic actions the State can take against its citizens. The potential loss to the parent is grievous, perhaps more so than the loss of personal freedom caused by incarceration.** *State in the Interest of A.E.,* 448 So.2d [183] at 185.

*State ex rel. A.L.D.,* 09-0820, pps. 8-9, (La.App. 3 Cir. 11/4/09), 21 So.3d 1109, 1114–15.

The Louisiana Supreme Court in *State ex rel A.T.,* 06-501 p. 4 (La.7/6/06), 936 So.2d 79, 82 (emphasis added) stated:

Title X of the Louisiana Children's Code governs the involuntary termination of parental rights. **Permanent termination of**

**the legal relationship existing between natural parents and children is one of the most drastic actions the State can take against its citizens.** However, the primary concern of the courts and the State remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the State. *State ex rel. S.M.W.,* 00–3277 (La.2/21/01), 781 So.2d 1223.

The grounds for taking this "most drastic action" by the State are set forth in Louisiana Children's Code Article 1015.[1] It is apparent to me that a simple reading

---

[1] The grounds for termination of parental rights are:
(1) Conviction of murder of the child's other parent.
(2) Unjustified intentional killing of the child's other parent.
(3) Conviction of a sex offense as defined in R.S. 15:541 by the natural parent which resulted in the conception of the child.
(4) Misconduct of the parent toward this child or any other child of the parent or any other child which constitutes extreme abuse, cruel and inhuman treatment, or grossly negligent behavior below a reasonable standard of human decency, including but not limited to the conviction, commission, aiding or abetting, attempting, conspiring, or soliciting to commit any of the following:
(a) Murder.
(b) Unjustified intentional killing.
(c) Aggravated crime against nature as defined by R.S. 14:89.1(A)(2).
(d) Rape.
(e) Sodomy.
(f) Torture.
(g) Starvation.
(h) A felony that has resulted in serious bodily injury.
(i) Abuse or neglect which is chronic, life-threatening, or results in gravely disabling physical or psychological injury or disfigurement.
(j) Abuse or neglect after the child is returned to the parent's care and custody while under department supervision, when the child had previously been removed for his safety from the parent pursuant to a disposition judgment in a child in need of care proceeding.
(k) The parent's parental rights to one or more of the child's siblings have been terminated due to neglect or abuse, prior attempts to rehabilitate the parent have been unsuccessful, and the court has determined pursuant to Article 672.1, that current attempts to reunite the family are not required.
(l) Sexual exploitation or abuse, which shall include, but is not limited to acts which are prohibited by R.S. 14:43.1, 43.2, 46.3, 80, 81, 81.1, 81.2, 82.1(A)(2), 89, and 89.1.
(m) Human trafficking when sentenced pursuant to the provisions of R.S. 14:46.2(B)(2) or (3).
(5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
(a) For a period of at least four months as of the time of the hearing, despite a diligent search, the whereabouts of the child's parent continue to be unknown.
(b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.
(c) As of the time the petition is filed, the parent has failed to maintain significant contact with the child by visiting him or communicating with him for any period of six consecutive months.

of these provisions makes clear that parental rights to one's child are to be terminated only as the result of extremely serious or prolonged ill treatment of the child endangering its safety and wellbeing.  It must be remembered here that In.A. did not voluntarily give up her child nor did she do anything that caused the State to remove the child from her care.  It was merely a practical necessity at I.A.'s birth because his mother, herself a child in need of care removed from her mother's home because of sexual abuse, was in no position to care for him.  Of all these provisions none really speak to the situation before us.  Both the lower court and the majority attempt to employ the provisions of part 6 of La. Childs.Code art. 1015 which provides:

(6) Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

(7) The child is in the custody of the department pursuant to a court order or placement by the parent; the parent has been convicted and sentenced to a period of incarceration of such duration that the parent will not be able to care for the child for an extended period of time, considering the child's age and his need for a safe, stable, and permanent home; and despite notice by the department, the parent has refused or failed to provide a reasonable plan for the appropriate care of the child other than foster care.

(8) The relinquishment of an infant pursuant to Chapter 13 of Title XI of this Code.

(9) The commission of a sex offense as defined in R.S. 15:541 by the natural parent which resulted in the conception of the child.

(10) The child is in the custody of the department pursuant to a court order for at least one year, unless sooner permitted by the court, and the identity of the child's father remains unknown and all the following have occurred:

(a) In the course of investigating the case and providing services to the family the department has been unable to learn the identity of the father.

(b) No party to the proceedings or the mother, if not a party, is able to provide a first and last name of a putative father or alias sufficient to provide a reasonable possibility of identification and location.

(c) The department has obtained all of the following:

(i) A certified copy of the child's birth certificate with no one indicated thereon as the father of the child, or the father listed has been determined not to be the biological father of the child.

(ii) A recent certificate from the putative father registry indicating that no person is listed or registered as the child's father.

(iii) A recent certificate from the clerk of court in the parish in which the child was born indicating that no acknowledgment with respect to this child has been recorded.

La. Child.Code art. 1015.

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; *there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.*

But this is a forced and strained application of the law. This provision speaks of a parent's "substantial compliance with a case plan" as a necessary precedent to "the safe return of the child" to its parent's custody. The trial court and the majority pay homage to these words and strive to make the evidence on the record fit the bill, but, in reality, this young mother is not yet of an age to have any chance of "substantial compliance" with a case plan designed only for mature adults. She is herself a child in need of much care including mental health therapy and the teaching of parenting skills as she passes from sixth to seventh grade. To invoke the mantra of this provision and to say, as did the trial judge, In.A. may be a young child but she is also a "parent," is to miss the whole point of article 1015 and to completely fail In.A. in making every reasonable effort to avoid the State taking the most "drastic action" that can be taken against a citizen of this State which includes even this girl of tender age. Likewise, the trial court and the majority make a strained effort to fit In.A. into the second part of La.Childs.Code art 1015(6) which requires a finding that "despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home." In its attempt to guage In.A.'s performance against this requirement the trial court and the majority again hold In.A. to the standard of a mature adult "parent" faulting her for her inability and/or unwillingness to change her condition or conduct. There is a world of difference between being unable because of her tender years and simply

6

being unwilling which the State, the trial court and the majority say is evidenced by In.A.'s irresponsible, "non-parental" behavior. I will not put the blame on this young mother in this regard and I believe it is mightily unfair to do so. I do, however, acknowledge that the tragedy of these circumstances is such that In.A. is so young and said to be developmentally challenged, evidenced by her need for special education, that she is years away from being able to meet the adult standards imposed by law. Even this is strained—by this classification Albert Einstein was developmentally challenged as he suffered from dyslexia.

In *State in Interest of C.E.K.*, 17-409 (La. App. 4 Cir. 12/21/17), 234 So. 3d 1059, 1068, *writ denied*, 18-0143, pps.13-14, (La. 3/9/18), 237 So. 3d 523, the appellate court explained that:

. . . "the abandonment statutes must be strictly construed ... the evidence must clearly show a manifestation of an intent to permanently avoid all parental responsibility and all reasonable doubt should be resolved against such a conclusion because a decree of termination [of] parental rights is in derogation of the natural rights of parents." *State in the Interest of Foret*, 398 So.2d 78, 81 (La. App. 4 Cir. 1981). *See also*, *In re A.D.H.*, 01-0107, p. 5 (La. App. 3 Cir. 5/2/01), 784 So.2d 854, 858, **("the termination of parental rights is a severe action which requires an onerous burden of proof"). Indeed, the "permanent termination of the parent-child legal relationship is one of the most drastic actions the State can take against its citizens."** *State in Interest of C.A.C.*, **11–1315, p. 7 (La. App. 4 Cir. 2/1/12), 85 So.3d 142, 146.** Accordingly, in determining whether parental rights should be involuntarily terminated, our jurisprudence has developed a two-pronged test: First, the State must prove by clear and convincing evidence the existence of at least one of the statutory grounds for termination under La. Ch. C. art. 1015. Second, after the ground for termination is found, the trial court must determine whether the termination is in the child's best interests. *State in Interest of A.S.*, 17-0028, p. 9 (La. App. 4 Cir. 5/10/17), 220 So.3d 179, 186, *writ denied*, 2017-1134 (La. 9/6/17), 224 So.3d 989. *See also*, *State in Interest of C.A.C.*, 11–1315, p. 8, 85 So.3d at 147.

I readily acknowledge that it is difficult to balance the concerns for what is in the best interest of I.A. with the concern for not destroying the most powerful bond of human beings, a mother and her child's bond. I.A. is being well cared for in foster care and is in a safe and happy environment. He and his mother get to visit regularly while In.A. advances in age and continues her schooling and learning about life. She

deserves, and is in great need of, mental health therapy and intensive instruction on parenting, neither of which she has received in good measure. Even at her young age, suffering traumatic stress, she has posed no real risk to her child. The majority notes there were scratches on I.A.'s abdomen after a visit with In.A., but the record shows others were present during that visit including another child and there is nothing from which to conclude that In.A. made the scratch marks. Nevertheless, the trial court and majority's apparent faulting of In.A. by implication for these scratches is as regrettable as it is unfounded. The other not-so-serious action of this young mother was an attempt at feeding I.A. a French fry during a visit and as evidence of her failure to follow instructions it is pointed out that she attempted to do so a second time. I must say I have known many adult mothers who have done the same and I do not recall anyone thinking it cause for such alarm as to amount to mistreatment. In *State ex rel. A.T.*, 06-501, pps. 5-13 (La. 7/6/06), 936 So. 2d 79, 82–87 (emphasis added), the supreme court explained at length the State's burden to provide meaningful help to parents before permanently terminating their rights to their children:

> In order to terminate parental rights, the court must find that the State has established at least one of the statutory grounds *by clear and convincing evidence. State ex rel. J.A.,* 99–2905 (La.1/12/00), 752 So.2d 806, 811 (citing La. Ch. C. Art. 1035(A); *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). Further, even upon finding that the State has met its evidentiary burden, a court still must not terminate parental rights unless it determines that to do so is in the child's best interests. La. Ch. C. Art. 1039; *State ex rel. G.J.L.,* 00–3278 (La.6/29/01), 791 So.2d 80, 85.
>
> . . . .
>
> The crux of this case, and the primary reason the OCS sought to terminate parental rights, was the failure of Ms. A. to substantially comply with the case plan pursuant to La. Ch. C. art. 1015(5) by her failure to obtain housing suitable for herself and her three children. Were the issue at stake merely whether or not the trial court's factual findings, that the State had proven by clear and convincing evidence that "at least one year had elapsed since [the children were] removed

from the parents' custody" and that "there has been no substantial parental compliance with a case plan ...," were manifestly erroneous, we would have to say that they were not. There is no dispute that the children were in state custody for at least one year and that all the case plans required Ms. A. to obtain and maintain adequate housing for herself and her three children and she clearly did not do so. However, the court of appeal reversed the trial court's finding not on this factual issue, but on the legal issue of *whether or not OCS had a statutory obligation, after the children were turned over to OCS, to remove the impediment to reunification prior to seeking termination of parental rights*. The court of appeal found that OCS had this legal obligation and that, *as a matter of fact, the record reflected that OCS had not made any effort to assist Ms. A in finding suitable housing after removal of the children from Ms. A's custody.*

Pursuant to the Adoptions and Safe Families Act of 1997, 42 U.S.C.A. § 601, *et seq.,* states are mandated to establish "permanency plans" for children within the foster care system. *State ex rel. J.M.,* 02–2089 (La.1/28/03), 837 So.2d 1247, 1256. The Act provides that such plans must demonstrate that **the State make *reasonable efforts to "preserve and reunify" the family*.** *Id.* If such measures fail, the State is mandated to make reasonable efforts to place a child for adoption or with a legal guardian. *Id.*

Accordingly, the Louisiana Children's Code provides that, except in extraordinary circumstances as set out in La. Ch. C. art. 672.1, **the State must undertake reasonable efforts to assist the parent in removing the obstacles to reunification.** For instance, at the first stage of the process, "[t]he court shall immediately determine whether reasonable efforts have been made by the department to prevent or eliminate the need for the child's removal ..." before granting an instanter order taking the child into state custody. La. Ch. C. art. 619(B). Further, at the hearing for continued custody, which in this case was held on October 31, 2002, "the court shall determine whether the department has made reasonable efforts as defined in Art. 603(17) to prevent or eliminate the need for removal of the child from his home, and after removal, *to make it possible for the child to safely return home.*" La. Ch. C. art. 626(B). "Reasonable efforts" are defined by La. Ch. C. art. 603(17) as "*the exercise of ordinary diligence and care by department caseworkers and supervisors and shall assume the availability of a reasonable program of services to children and their families.*"

It is undisputed in this case that the only effort OCS made to assist Ms. A in obtaining adequate housing was to provide Ms. A with rent-free housing for three months, and a two-month extension, prior to Ms. A turning the children over to OCS in October of 2002. **However, the duty to make reasonable efforts to remove the impediments to reunification does not necessarily stop once the children are removed from the parent's custody.** In fact, Article 672.1 sets out the only circumstances under which reunification efforts are not required

and even then, the State must file a motion for a judicial determination that efforts at reunification are not required and prove as much by clear and convincing evidence. *See* footnote 4, *supra.* The State did not do so in this case.

In addition, in order to support removal of a child from the custody of a parent in any such disposition, La. Ch. C. art. 682 provides that the court must "determine whether the department has made reasonable efforts to prevent or eliminate the need for removal of the child from his home and, after removal, to reunify the parent and child or to finalize the child's placement in an alternative safe and permanent home in accordance with the child's permanent plan." Further, "[t]he department shall have the burden of demonstrating reasonable efforts." La. Ch. C. art. 682(A). Thus, *at least as long as the child's permanent plan is reunification, in accordance with that plan, the State has the duty to make reasonable efforts to reunify the parent and child.*

Finally, at the stage where a child has been adjudged in need of care and termination of parental rights proceedings have been filed, grounds exist for involuntary termination under La. Ch. C. Art. 1015(5) only where the child has been removed from the parents' custody for one year pursuant to court order, there has been no substantial compliance with a *case plan for services* which has been approved by the court as *necessary for the safe return of the child,* and *despite earlier intervention,* there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future. Unlike the other grounds listed in La. Ch.C. art. 1015, termination under La. Ch. C. art. 1015(5) may only be ordered "after affirmative efforts have been attempted by the state to reunite the family by providing rehabilitative services, if needed, to the parent." Lucy S. McGough and Kerry Triche, *Louisiana Children's Code Handbook,* p. 522 (2006).

Here, the trial court's order terminating parental rights under La. Ch. C. art. 1015(5) was erroneous because the record reflects that OCS never undertook reasonable efforts at reunification after the children were taken into state custody. OCS admits that no rehabilitative services were offered to Ms. A to assist her in obtaining suitable housing after the children were taken into custody in October of 2002, yet this was the main, if not sole, impediment to reunification cited continuously by OCS.

*Further, based on this record it is impossible to discern whether Ms. A was unable to provide adequate housing because of lack of adequate assistance or was simply unwilling to provide adequate housing. This is significant because clearly if she was simply unwilling, grounds for termination would exist. However, the State bears the burden of proof by clear and convincing evidence and where the record does not reflect that in spite of reasonable efforts by the State to provide assistance, the parent still would not obtain adequate housing, this burden cannot be met.* **On the other hand, under our law, a child**

**cannot even be found to be a child in need of care under La. C.C. art. 606 where the sole ground for taking the child into state custody is that the "parent is unable to provide basic support, supervision, treatment, or services due to inadequate financial resources." La. C. Ch. art. 606(B); *see also* La. C. Ch. art. 603(14)(a) ("Consistent with Article 606(B), the inability of a parent or caretaker to provide for a child due to inadequate financial resources shall not, for that reason alone, be considered neglect"). In fact, this Court has held that termination of parental rights would be unjustified if lack of stable housing is the only ground for such termination**. *State ex rel. S.M.W., supra* at 1236. In this case, the record does not contain clear and convincing evidence that termination is warranted under La. Ch. C. art. 1015(5).

. . . .

Contrary to the State's argument, the judgment of the court of appeal ordering a remand to the trial court "with instructions to exercise its power under La. Ch. C. art. 677 to require the case plan for reunification of this family to include ..." does not direct the trial court to rewrite the case plan itself, nor does it determine a specific placement for the children. The remand simply directs that before Ms. A's parental rights can be terminated under La. Ch. C. art. 1015(5), the record must reflect that the State made some sort of reasonable efforts to assist Ms. A in obtaining adequate housing. However, given that these children have already been in foster care for a lengthy period, time is of the essence. Therefore, the trial court must direct these efforts will be undertaken on an expedited basis and Ms. A must actively participate in pursuing all assistance offered by OCS.

Thus, one question here is whether the trial court manifestly erred in finding that the State has made reasonable efforts to help In.A. so that she may be able to offer I.A. a safe, stable, and permanent environment in which he can thrive. This is a particularly difficult decision to make in this case because the most serious impediment to In.A. meeting this requirement is her young age. Although I think the record shows the State has not provided In.A. the level of mental health assistance she needs and deserves, nor the amount of parenting instruction she needs, I believe the facts of this case also show that because of In.A.'s young age during the future time frame for her to potentially achieve the necessary goals is prohibitively long. The law does not favor holding I.A. in prolonged limbo so that his young mother can

11

advance in age to a point sufficient to care for herself and her young child. It is for this reason I feel I must concur in the result of the majority's ruling. Again, I stress the importance here of **adoption of I.A. by maternal family members as the favored course of action.** In *State in Interest of P.B.*, 49,668, pps. 7-11, (La. App. 2 Cir. 12/17/14), 154 So. 3d 806, 812–13, our sister circuit offered a clear perspective on this difficult situation:

> More than simply protecting parental rights, our judicial system is required to protect the children's rights to thrive and survive. *State in the Interest of S.M.,* 98–0922 (La.10/20/98), 719 So.2d 445. Furthermore, a child has an interest in the termination of rights that prevent adoption and inhibit that child's establishment of secure, stable, long term, continuous family relationships. *Id.*
>
> . . . .
>
> That children have a need for permanency is well established in the jurisprudence and it is not the intent of either state or federal law that children remain in foster care permanently. *State in the Interest of S.M., supra; State ex rel. J.M.,* 02–2089 (La.1/28/03), 837 So.2d 1247; *State ex rel. C.E.C. v. D.M.D.B.,* 40,409 (La.App.2d Cir.9/28/05), 912 So.2d 418. Thus, the length of time a child has been forced to remain in foster care is a factor the courts consider in the termination of parental rights decision. *Id.*

I do not believe we arrive at the right solution to this difficult situation by placing blame on a young child forced into motherhood against her will or force fitting the application of laws never intended to address this situation. In.A. may well be a "parent" as the trial court and the majority notes, but she is nevertheless a young child in need of much care for her own wellbeing and future happiness. I do not believe we can guage In.A.'s willingness or ability to parent her child measured against tests designed to determine whether adults of mature age are serious about correcting their shortcomings to prove they are capable of parenting their children. It is the focus on the needs and rights of I.A. which ought to guide our decision in this case—not strained assignment of blame on this innocent mother. In the words quoted by Judge Ernestine Gray in her law review article "The adoption and Safe

Families Act of 1997 Confronting an American Tragedy," 46 La. Bar Journal 477, 481 (1999):

> As we go about this work on a daily basis, we must remember what has been said:
>
> > *We are guilty of many errors and many faults but our worse crime is abandoning the children neglecting the fountain of life.*
> >
> > *Many of the things we need can wait. The child cannot.*
> >
> > *Right now is the time bones are being formed blood is being made senses are being developed.*
> >
> > *To the child we cannot answer "Tomorrow."*
> >
> > *The child's name is "Today."*

For these reasons I respectfully concur.